Thomas A. Zimmerman, Jr. *
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, IL 60602
(312) 440-0020; Fax: (312) 440-4180
*tom@attorneyzim.com*

Marc E. Dann *
DANNLAW
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539; Fax: (216) 373-0536
*notices@dannlaw.com*

Derek W. Loeser *
Gretchen Freeman Cappio *
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
(206) 623-1900; Fax (206) 623-3384
*dloeser@kellerrohrback.com*
*gcappio@kellerrohrback.com*

* *Admitted pro hac vice*

[Additional Counsel Appear on Signature Page]

Attorneys for Plaintiffs and the Putative Classes

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE WELLS FARGO UNAUTHORIZED PRODUCTS LITIGATION | No. 3:24-CV-01223-TLT(LJC) (Consolidated) |

District Judge Trina L. Thompson

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR:**

1. Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*;
2. Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code. § 17200 *et seq.*;
3. Violations of the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et seq.*;
4. Violations of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.68 *et seq.*;
5. Violations of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43 *et seq.*
6. Violations of the Nevada Trade Regulations and Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.*;

7. Violations of the Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.*;
8. Violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*;
9. Violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*;
10. Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*;
11. Unjust Enrichment;
12. Conversion;
13. Invasion of Privacy by Intrusion Upon Seclusion.

Complaint Filed:  February 29, 2024

Consolidated
Complaint Filed:  May 1, 2024

First Amended Consolidated Class Action Complaint Filed: June 24, 2024

Trial Date:        August 31, 2026

**JURY TRIAL DEMANDED**

Plaintiffs Amanda Gonzales, Vikalp Agrawal, Christopher Barker, Nazia Barker, Calvin Boyd, Matt Boyle, Matt Brady, Jane Cothern, Basil Higgs, Matt Huber, Ezdehar Husein, Claudia Martinez, Joseph Mitchell, Chad Nicholson, Alcira Rocha, Sean Rose, Carey Runzel-Oberly, John Schultz, Clenten Sims, Winfred "Mo" Thomas, Sara White, Joseph Young, and Trevor Zander ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint against Defendants Wells Fargo & Company and Wells Fargo Bank, N.A. (collectively, "Wells Fargo"), and make the following allegations based on personal knowledge as to facts pertaining to their own experiences, and on information and belief, as well as the investigation of counsel, as to all others.

## INTRODUCTION

***"Put simply, Wells Fargo is a corporate recidivist
that puts one third of American households at risk of harm."***[1]

1.     Since at least the early 2000s, Wells Fargo has unilaterally enrolled consumers— Plaintiffs and putative Class members—in products and services that the consumers never agreed to and did not want. The unauthorized products and services include, but are not limited to, an "Accidental Death" insurance product, an "Identity Theft Protection – Affinion" service and product, an "Income Protector Plus" product, a "Health Protector Bonus" product, a "Home Warranty" product, a "Disaster Mortgage" product, "Health Discount/Best Benefits Plan" product, "Credit Defense" product, a "Hospital Accident" product, an "Unemployment" product, a "FDP Multiple Products" product, a "Preferred" product, a "Purchase Shield" product, an "Accidental Disability" product, a "Term Life" product, an "INS Single Individual Life" product, an "Optional" product, and a "Sign/Drive Bonus" product (collectively, "Unauthorized Products").

2.     For all Unauthorized Products, Wells Fargo's conduct has been the same. Wells Fargo established an aggressive quota-based compensation system and failed to implement adequate safeguards, incentivizing Wells Fargo employees and affiliated business entities to enroll consumers in

---

[1] *Prepared Remarks of CFPB Director Rohit Chopra on the Wells Fargo Law Enforcement Action*, Consumer Fin. Prot. Bureau (Dec. 20, 2022), https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-on-the-wells-fargo-law-enforcement-action/.

Unauthorized Products without their knowledge, to meet those goals. Wells Fargo then collected fees, either from the consumers, or as commissions or other remuneration from third parties in exchange for enrolling their customers in the Unauthorized Products. Such actions were designed to, and did, enrich Wells Fargo at the expense of Plaintiffs and putative Class members.

3.    The unauthorized enrollment of Plaintiffs and Class members in the Unauthorized Products at issue here stems from Wells Fargo's decades-long abusive, grossly negligent, and unlawful business practices.

4.    In a 2016 Consent Order, the Office of the Comptroller of the Currency ("OCC")—the bureau of the Department of the Treasury ("DOT") that regulates national banks, including Wells Fargo Bank, N.A.—found that for many years Wells Fargo engaged in unsound banking practices, fostered by a compensation structure that "***pressured Bank employees to sell Bank products not authorized by the customer***."[2] The OCC further found that Wells Fargo's "reckless" business practices were "part of a pattern of misconduct" in which Wells Fargo was "unjustly enriched."[3] Wells Fargo lacked an "Enterprise-Wide Sales Practices Oversight Program" that could "provide sufficient oversight to prevent and detect" such malfeasance.[4]

5.    Wells Fargo's unauthorized enrollment of Plaintiffs and putative Class members in the unwanted products at issue stems in large part from Wells Fargo's misguided employee compensation policies and its lack of adequate internal oversight and compliance functions. The compensation policies incentivized and pressured Wells Fargo employees to enroll consumers in products and services they did not want or consent to, and there was no oversight to ensure this did not occur.

6.    Plaintiffs and putative Class members began learning about Wells Fargo's misconduct in about November 2023 when Wells Fargo started sending form letters to at least tens of thousands, if not hundreds of thousands, of consumers across the United States advising that, "[d]uring a recent

---

[2] Consent Order ("2016 Consent Order") at 2, No. AA-EC-2016-66 (DOT OCC Sept. 6, 2016), https://www.occ.gov/news-issuances/news-releases/2016/nr-occ-2016-106b.pdf (emphasis added) (focusing on the opening of unauthorized bank and credit card accounts).
[3] *Id.* at 3.
[4] *Id.* at 2.

review of our current and former customer accounts," Wells Fargo determined that "you were enrolled in the" product or service specified in the letter.

7.    However, notwithstanding being repeatedly caught and punished for its bevy of bad behavior, to this day Wells Fargo continues to try to avoid full accountability for its wrongdoing by failing to provide consumers with complete and accurate information about its enrollment of consumers in the Unauthorized Products. The notification letters Wells Fargo sent to Plaintiffs and putative Class members lack critical information consumers need in order to understand how they were enrolled in the Unauthorized Products, and what, when, and how they were charged for the products. Had Wells Fargo provided this critical information to consumers, more consumers likely would have responded to the remediation letters, instead of ignoring them or concluding that they were a scam.

8.    Perhaps worse, for consumers that respond to the letters, Wells Fargo utilizes tactics to try to minimize the dollar amount of relief it offers, including by refusing to provide information as to amounts customers improperly had taken from them for the Unauthorized Products, followed by steering customers who complain toward a bogus and unfair mediation process.

9.    Plaintiffs bring this case against Wells Fargo for its violations of laws, including the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, state unfair and deceptive trade practices laws, common law conversion, unjust enrichment, and invasion of privacy by intrusion upon seclusion.

## **PARTIES**

10.    Plaintiff Amanda Gonzales is a natural person and resident of New Mexico. Plaintiff Gonzales never agreed to or wanted the Accidental Death product that Wells Fargo enrolled her in without her knowledge or authorization.

11.    Plaintiff Vikalp Agrawal is a natural person and resident of North Carolina. Plaintiff Vikalp Agrawal never agreed to or wanted the Preferred product, the Purchase Shield (English and Spanish), the Sign/Drive Bonus, or the Health Protector Bonus products that Wells Fargo enrolled him in without his knowledge or authorization.

12.     Plaintiff Christopher Barker is a natural person and resident of Nevada. Plaintiff Chris Barker never agreed to or wanted the Identity Theft Protection – Affinion product that Wells Fargo enrolled him in without his knowledge or authorization.

13.     Plaintiff Nazia Barker is a natural person and resident of Nevada. Plaintiff Nazia Barker never agreed to or wanted the Preferred product that Wells Fargo enrolled her in without her knowledge or authorization.

14.     Plaintiff Matt Boyle is a natural person and resident of New Jersey. Plaintiff Boyle never agreed to or wanted the Accidental Death product that Wells Fargo enrolled him in without his knowledge or authorization.

15.     Plaintiff Calvin Boyd is a natural person and resident of Texas. Plaintiff Boyd never agreed to or wanted the Identity Theft Protection – Affinion, Home Warranty, or Accidental Death insurance products that Wells Fargo enrolled him in without his knowledge or authorization.

16.     Plaintiff Matt Brady is a natural person and resident of Arkansas. Plaintiff Brady never agreed to or warranted the Identity Theft Protection – Affinion product that Wells Fargo enrolled him in without his knowledge or authorization.

17.     Plaintiff Jane Cothern is a natural person and resident of California. Plaintiff Cothern never agreed to or wanted the Disaster Mortgage, Optional, or Accidental Death products that Wells Fargo enrolled her in without her knowledge or authorization.

18.     Plaintiff Basil Higgs is a natural person and resident of North Carolina. Plaintiff Higgs never agreed to or wanted the Income Protector Plus product that Wells Fargo enrolled him in without his knowledge or authorization.

19.     Plaintiff Matt Huber is a natural person and resident of Minnesota. Plaintiff Huber never agreed to or wanted the Identity Theft Protection – Affinion or Credit Defense products that Wells Fargo enrolled him in without his knowledge or authorization.

20.     Plaintiff Ezdehar Husein is a natural person and resident of Texas. Plaintiff Husein never agreed to or wanted the INS Single Individual Life product that Wells Fargo enrolled her in without her knowledge or authorization.

21.     Plaintiff Claudia Martinez is a natural person and resident of California. Plaintiff Martinez never agreed to or wanted the Unemployment product that Wells Fargo enrolled her in without her knowledge or authorization.

22.     Plaintiff Joseph Mitchell is a natural person and resident of Georgia. Plaintiff Mitchell never agreed to or wanted the Identity Theft Protection – Affinion, Hospital Accident, and Term Life products that Wells Fargo enrolled him in without his knowledge or authorization.

23.     Plaintiff Chad Nicholson is a natural person and resident of Florida. Plaintiff Nicholson never agreed to or wanted the Disaster Mortgage or Income Protector Plus products that Wells Fargo enrolled him in without his knowledge or authorization.

24.     Plaintiff Alcira Rocha is a natural person and resident of California. Plaintiff Rocha never agreed to or wanted the Accidental Death or Health Discount/Best Benefits Plan products that Wells Fargo enrolled her in without her knowledge or authorization.

25.     Plaintiff Sean Rose is a natural person and resident of California. Plaintiff Rose never agreed to or wanted the Health Protector Bonus product that Wells Fargo enrolled him in without his knowledge or authorization.

26.     Plaintiff Carey Runzel-Oberly is a natural person and resident of California. Plaintiff Runzel-Oberly never agreed to or wanted the Identity Theft Protection – Affinion or Health Protector Bonus products that Wells Fargo enrolled her in without her knowledge or authorization.

27.     Plaintiff John Schultz is a natural person and resident of Illinois. Plaintiff Schultz never agreed to or wanted to "FDP Multiple Products" product that Wells Fargo enrolled him in without his knowledge or authorization.

28.     Plaintiff Clenten Sims is a natural person and resident of California. Plaintiff Sims never agreed to or wanted the Accidental Disability product that Wells Fargo enrolled him in without his knowledge or authorization.

29.     Plaintiff Winfred "Mo" Thomas is a natural person and resident of Georgia. Plaintiff Thomas never agreed to or wanted the Sign/Drive Bonus, Income Protector Plus, or Health Protector Bonus products that Wells Fargo enrolled him in without his knowledge or authorization.

30.     Plaintiff Sara White is a natural person and resident of Mississippi. Plaintiff White never agreed to or wanted the Income Protector Plus or Sign/Drive Bonus products that Wells Fargo enrolled her in without her knowledge or authorization.

31.     Plaintiff Joseph Young is a natural person and resident of Texas. Plaintiff Young never agreed to or wanted the Hospital Accident product that Wells Fargo enrolled him in without his knowledge or authorization.

32.     Plaintiff Trevor Zander is a natural person and resident of Minnesota. Plaintiff Zander never agreed to or wanted the Credit Defense product that Wells Fargo enrolled him in without his knowledge or authorization.

33.     Defendant Wells Fargo & Company is incorporated in Delaware with its principal place of business and corporate headquarters in San Francisco, California. Wells Fargo & Company is a financial services company with approximately $1.9 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance to 68 million customers through more than 5,600 branches, and 11,000 ATMs.[5] It has approximately 226,000 employees as of 2024.[6]

34.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services and is Wells Fargo & Company's wholly-owned, principal operating subsidiary.

## JURISDICTION AND VENUE

35.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1332(d), because this case is brought as a class action, at least one class member is diverse from one Defendant, there are 100 or more Class members, and the aggregate amount in controversy exceeds $5 million.

36.     This Court alternatively has jurisdiction pursuant to 28 U.S.C. § 1331, as one of the causes of action arises out of Defendant's violations of the FCRA, 15 U.S.C. § 1681 *et seq*. This Court has supplemental jurisdiction to hear all state law statutory and common law claims pursuant to 28 U.S.C. § 1367.

---

[5] *About Wells Fargo*, Wells Fargo & Co., https://www.wellsfargojobs.com/en/life-at-wells-fargo/about-us/ (last visited Dec. 19, 2024).

[6] *Id.*

37.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)–(3) because the Court has personal jurisdiction over Defendants, Defendants reside in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

38.     Pursuant to Civil L.R. 3-2(c)–(d), this case is properly assigned to the San Francisco or Oakland Division because a substantial part of the events or omissions that give rise to Plaintiffs' and Class members' claims occurred in San Francisco County.

## ADDITIONAL FACTUAL ALLEGATIONS

### *Wells Fargo Unilaterally Enrolled Plaintiffs and Class Members in the Unauthorized Products*

39.     Without their knowledge or consent, Wells Fargo "enrolled" Plaintiffs and putative Class members in various financial or insurance products and services that Plaintiffs and putative Class members never agreed to, never wanted, and never knew they were enrolled in.

40.     Wells Fargo knows Plaintiffs and putative Class members never authorized the "enrollment" for the products or services.

41.     According to the notification letters, Wells Fargo conducted a "recent review of [its] current and former customer accounts." That review, upon information and belief, stemmed from multiple regulatory enforcement actions by the OCC and the Consumer Financial Protection Bureau ("CFPB") against Wells Fargo since 2016, resulting in Wells Fargo identifying customers unknowingly enrolled by Wells Fargo in various Unauthorized Products. Wells Fargo identified Plaintiffs and putative Class members as having been enrolled in such products and services.

42.     Plaintiffs and putative Class members were enrolled in the various products or services, without their authorization or knowledge, because Wells Fargo's business model financially incentivized its employees to focus on product sales and because Wells Fargo lacked adequate compliance and oversight to prevent the unauthorized enrollments. Wells Fargo employees were required to meet aggressive sales goals, and enrolling customers in third-party products counted toward these goals.

43.     Wells Fargo employees were trained to meet their sales goals by enrolling Wells Fargo customers in Wells Fargo products and accounts as well as third-party insurance products. Employees were encouraged to meet the "eight-is-great" goal, meaning that Wells Fargo employees were expected to open or sell eight products per customer via cross-selling, including third-party insurance products. Employees received bonuses for meeting sales goals. The bonuses were higher for third-party insurance products than they were for Wells Fargo's own products because the third-party products generated more profit for Wells Fargo. Moreover, employees received payments on an ongoing basis for revenue generating products in which they enrolled their customers. Thus, the incentive to enroll customers in third-party insurance and other products was high, and Wells Fargo was well aware that its compensation structure produced abusive sales practices and widespread misconduct.

44.     Enrolling Wells Fargo customers in third-party insurance products without authorization was easy to do. Wells Fargo employees had access to online programs created by the third-party insurance product providers through which Wells Fargo employees could directly complete applications for the customers. To input customer information, Wells Fargo employees could simply copy customer information from the Wells Fargo program and paste it into the third-party insurance provider program. This information included the customer name, address, date of birth, and Social Security number, among other information. No customer signature, or other indication of customer knowledge or consent, was required to copy and paste customer information, including personally identifiable information into the third-party insurance provider program. In addition, although third-party products had required disclosures that Wells Fargo bankers were supposed to read and provide to Wells Fargo customers prior to enrollment, the disclosures were not provided by Wells Fargo. As a result, customers were not provided with fee and other information for the products in which they were unwittingly enrolled. Moreover, until the policy was changed in approximately 2015, Wells Fargo employees were able to enroll customers in third-party insurance products even if the customers were not present in the branch.

45.     Compounding the problem, for some products, charges were bundled in a way that made detection difficult. For example, the Loan Payment Protection product increased the cost of the underlying loan but was not separately billed. In addition, products that were billed as separate line

items did not include sufficient detail to put Plaintiffs on notice of what the charges were for, or Wells Fargo's role in enrolling them.

46. Wells Fargo's knowledge that Plaintiffs and putative Class members never authorized the "enrollment" for the products or services also is evidenced by Wells Fargo unilaterally terminating Plaintiffs' and putative Class members' enrollment in the products and services without ever obtaining their explicit authorization. Wells Fargo knew Plaintiffs and Class members did not authorize the enrollment in the first place, and so Wells Fargo had no problem unilaterally canceling the products and services.

47. During the time period in which Plaintiffs and putative Class members had been enrolled in the Unauthorized Products, Wells Fargo charged them fees—and sometimes interest on the fees or allowed third-party vendors to charge them fees—for those products and services. Wells Fargo also earned commissions, fees and other remuneration from the third-party product providers as a direct result of their customers' enrollment in the Unauthorized Products.

48. When enrolling Plaintiffs and putative Class members in the various unauthorized products and services, Wells Fargo also opened accounts specific to the particular customer and the product so that Wells Fargo could track its receipt of fees and interest it charged to, and collected from, Plaintiffs and putative Class members for unauthorized enrollment in such products and services.

49. When collecting fees and interest from Plaintiffs and putative Class members for the various Unauthorized Products that Wells Fargo had secretly enrolled them in, Wells Fargo transferred customer funds in and out of those accounts. On information and belief, these individual transfers were in small amounts that are difficult for consumers to detect despite reasonable diligence.

50. For those Plaintiffs and putative Class members that Wells Fargo collected fees for the Unauthorized Products via a transfer or withdrawal from another of their customer accounts, Wells Fargo necessarily transferred customer funds between the customer's existing accounts and any account Wells Fargo had created to collect the fees for the Unauthorized Products. On information and belief, these individual transfers and withdrawals were in small amounts that are difficult for consumers to detect despite reasonable diligence.

51.     As a result of being enrolled in products and services they did not authorize or want, Plaintiffs and putative Class members unknowingly paid fees for those products and services, and lost the time value of interest they could have earned on the fees they paid, and to the extent they might have been able to benefit from the products or services, they were unaware of their existence and therefore unable to enjoy the benefits of the products or services that were purchased without their authorization.

52.     Wells Fargo unlawfully converted, transferred, and obtained fees, interest, penalties, and other benefits from its unauthorized enrollment of Plaintiffs and Class members in the at-issue products and services.

53.     As a result of paying fees for products and services they did not authorize or want, Plaintiffs and putative Class members suffered actual damages in an amount to be determined at trial. In addition, Wells Fargo was paid commissions, fees, and other remuneration directly by the third-party product providers for enrolling customers in the Unauthorized Products, which unjustly enriched Wells Fargo.

### *Wells Fargo's Historical Unfair and Illegal Business Practices Are Primary Causes of Its Misconduct at Issue Here*

54.     Wells Fargo is no stranger to taking advantage of consumers by charging them for products or services they do not need or want. It has a long history of engaging in such unfair and unlawful business practices at the expense of consumers and the general public. In fact, Wells Fargo has engaged in a pattern and practice of taking advantage of customers by forcing them to open accounts and buy products that they did not authorize nor desire. The combination of insufficient oversight and aggressive sales quota-based compensation plans has proven time and time again to be a dangerous cocktail at Wells Fargo, causing Wells Fargo employees to engage in misconduct.

55.     In 2015, "Wells Fargo and Assurant face[d] a force-placed insurance lawsuit alleging the financial firms artificially inflated force-placed insurance premiums charged to homeowners."[7] The plaintiffs in that lawsuit alleged that "the companies provided 'unnecessary or duplicative coverage'

---

[7] Heidi Turner, *Wells Fargo Hit with Force-Placed Insurance Lawsuit*, LawyersandSettlements.com (Aug. 19, 2015, 1:30 PM), https://www.lawyersandsettlements.com/legal-news/forced-placed-insurance-lawsuits/lender-insurance-lenders-force-placed-26-20854.html.

because the policies were backdated to collect premiums when there was no lapse in coverage or no risk of loss."[8]

56.    In September 2016, the OCC entered into a Consent Order with Wells Fargo resulting from the OCC's regulatory examination of Wells Fargo's unsafe, unsound, and illegal business practices in opening approximately 1.5 million fake deposit accounts and more than 500,000 fake credit card accounts in customers' names without their knowledge or approval.[9]

57.    The OCC found that for many years Wells Fargo had engaged in unsafe and unsound banking practices, fostered by a business model and an incentive compensation structure that "pressured Bank employees to sell Bank products not authorized by the customer."[10] Specifically, the 2016 Consent Order provided that the OCC found:

> (1) ***The Bank's business model emphasized sales of the Bank's products and services to Bank customers.*** As part of this model, ***the Bank set sales goals and established an incentive compensation structure that emphasized sales of Bank products and services to customers by Bank employees.***
>
> (2) In the course of its ongoing supervision of the Bank, the OCC has identified the following deficiencies and unsafe or unsound practices in the Bank's risk management and oversight of the Bank's sales practices:
>
> > (a) ***The incentive compensation program*** and plans within the Community Bank Group were not aligned properly with local branch traffic, staff turnover, or customer demand, and they fostered the unsafe or unsound sales practices described in Paragraph (3) of this Article and ***pressured Bank employees to sell Bank products not authorized by the customer***.
> >
> > (b) ***The Bank lacked an Enterprise-Wide Sales Practices Oversight Program and thus failed to provide sufficient oversight*** to prevent and detect the unsafe or unsound sales practices described in Paragraph (3) of this Article and failed to mitigate the risks that resulted from such sales practices.
> >
> > (c) The Bank lacked a comprehensive customer complaint monitoring process . . . .
> >
> > (d) ***The Bank's Community Bank Group failed to adequately oversee sales practices*** and failed to adequately test and monitor branch employee sales practices.
> >
> > (e) The Bank's audit coverage was inadequate because it failed to include in its scope an enterprise-wide view of the Bank's sales practices.

---

[8] *Id.*

[9] *See* 2016 Consent Order.

[10] *Id.* at 2 (focusing on the opening of unauthorized bank and credit card accounts).

(3) In the course of its ongoing supervision, *the OCC has identified the following unsafe or unsound sales practices in the Bank's Community Bank Group* (referred to as "unsafe or unsound sales practices" within this Order):

    (a) The *selling of unwanted deposit or credit card accounts*.

    (b) The *unauthorized opening of deposit or credit card accounts*.

    (c) The *transfer of funds from authorized, existing accounts to unauthorized accounts* ("simulated funding").

    (d) *Unauthorized credit inquiries for purposes of the conduct described in subparagraphs (a) and (b) of this paragraph*.

(4) By reason of the conduct set forth in Paragraphs (2) and (3) above, *the Bank engaged in reckless unsafe or unsound banking practices that were part of a pattern of misconduct*.

(5) *By reason of the conduct set forth in Paragraph (3) above, the Bank was unjustly enriched*.[11]

58.    Pursuant to the 2016 Consent Order, Wells Fargo paid the OCC $35 million in civil penalties and was required to implement changes to its business practices.

59.    However, the depth of Wells Fargo's unfair and unlawful business practices regarding Unauthorized Products had not yet been fully uncovered. Two years later, in April 2018, the OCC and Wells Fargo entered into a second consent order, revealing that Wells Fargo's practices went beyond unauthorized deposit and credit card accounts and included improper placement of collateral protection insurance.[12] The OCC's action was closely coordinated with a parallel action brought by the CFPB.

60.    In the 2018 Consent Order the OCC found, in part:

(1) Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile. *The Bank's failure to implement and maintain a satisfactory compliance risk management program has caused the Bank to engage in reckless unsafe or unsound practices and violations of law*.

. . .

(4) [P]rior to June 2012, and continuing through October 2016, *the Bank's Dealer Services unit, and its vendor, caused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies* on automobile loan accounts . . . .

(5) *As a result of the Bank's improper CPI placement practices, borrowers were improperly charged CPI premiums, interest, and fees* . . . .

---

[11] *Id.* at 1–3 (emphasis added).

[12] Consent Order ("2018 Consent Order"), No. AA-EC-2018-15 (DOT OCC Apr. 20, 2018), https://www.occ.gov/static/enforcement-actions/ea2018-025.pdf.

(6) ***The Bank's aforementioned practices with respect to CPI constituted unfair acts or practices in or affecting commerce*** in violation of the unfair acts or practices provision of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and were unsafe or unsound.

. . .

(9) ***By reason of the foregoing conduct, the Bank engaged in*** reckless unsafe or unsound practices and violations of law that were part of ***a pattern of misconduct, and was unjustly enriched***.[13]

61.    In conjunction with the 2018 Consent Order and the "severity of the deficiencies and violations of law, the financial harm to consumers, and [Wells Fargo's] failure to timely correct the deficiencies and violations in a timely manner," Wells Fargo was assessed a $500 million civil money penalty by the OCC and a $1 billion penalty by the CFPB.[14]

62.    In July of 2018, KTLA 5 News reported a story entitled, "Wells Fargo Begins Refunding Customers Charged for Unauthorized Products Including Pet Insurance," noting that "Wells Fargo ha[d] begun refunding customers who were harmed when the bank charged them for products including pet insurance, legal services, home warranties and other forms of insurance[.]"[15] In a statement made by Wells Fargo to KTLA 5 News, Wells Fargo said it was "'reviewing' add-on products sold by the bank or its service providers. 'If issues are found during this review, we will make things right with customers in the form of refunds or remediation[.]'"[16]

63.    In December 2022 Wells Fargo entered into yet another consent order, this time with the CFPB in connection with a its enforcement action.[17] The 2022 Consent Order "identified . . . violations of law" for certain of Wells Fargo's auto loan servicing, mortgage loan modification, and

---

[13] *Id.* at 2–4 (emphasis added).

[14] *OCC Assesses $500 Million Penalty Against Wells Fargo, Orders Restitution for Unsafe or Unsound Practices*, OCC (Apr. 20, 2018), https://www.occ.gov/news-issuances/news-releases/2018/nr-occ-2018-41.html.

[15] *Wells Fargo Begins Refunding Customers Charged for Unauthorized Products Including Pet Insurance*, KTLA 5 News (July 19, 2017, 7:07 PM), https://ktla.com/news/local-news/wells-fargo-begins-refunding-customers-charged-for-unauthorized-products-including-pet-insurance-home-warranties.

[16] *Id.*

[17] Consent Order ("2022 Consent Order"), *In re Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 (CFPB Dec. 20, 2022), https://files.consumerfinance.gov/f/documents/cfpb_wells-fargo-na-2022_consent-order_2022-12.pdf.

customer account sales practices in which Wells Fargo agreed to pay a $1.7 billion civil monetary penalty and $2 billion in financial restitution to its consumers.[18]

64.    Commenting on the CFPB's 2022 enforcement action underlying the 2022 Consent Order, CFPB Director Rohit Chopra stated:

> In the CFPB's eleven years of existence, **Wells Fargo has consistently been one of the most problematic repeat offenders of the banks and credit unions we supervise**:
>
> > • In 2015, CFPB ordered Wells Fargo to pay $24 million in penalties for its role in an illegal mortgage kickback scheme.
> >
> > • In 2016, it paid $4 million to the CFPB for scamming student loan borrowers. A few months later, the CFPB fined Wells Fargo $100 million for its fake account fraud.
> >
> > • In 2018, the CFPB assessed a $1 billion fine for illegal fees and insurance practices in its auto lending and mortgage lending business.
>
> **The list could go on and on**, from defrauding the government to labor abuses and more. The Department of Justice, state attorneys general and other federal regulators have obtained billions more in forfeitures, including civil and criminal fines.
>
> **Put simply, Wells Fargo is a corporate recidivist that puts one third of American households at risk of harm**.[19]

65.    Regulatory scrutiny of Wells Fargo is not limited to federal regulators. California's Department of Insurance ("CDI") instituted an Accusation on November 30, 2017, for Wells Fargo's misconduct as a licensed Accident and Health Agent and Life-Only Agent, with Variable Contracts Authority, and as a Property Broker-Agent and Casualty Broker-Agent. The CDI sought to suspend or revoke Wells Fargo's insurance licenses pursuant to numerous provisions of California's Insurance Code.[20]

66.    The Accusation referenced the April 10, 2017, report of the Independent Directors of the Board of Wells Fargo & Company ("Independent Report"), which detailed abusive sales practices motivated by Wells Fargo's compensation structure. These practices concerned both Wells Fargo's

---

[18] *Id.* at 1.
[19] *Supra* note 1 (emphasis added).
[20] *See generally* Accusation, *In re Wells Fargo Bank, N.A.*, No. LA201600665-AP (Cal. Ins. Comm'r Nov. 30, 2017), https://www.insurance.ca.gov/0400-news/0100-press-releases/archives/upload/nr134-2017Wells-Fargo-Accusation.pdf.

own product offerings (checking, savings, and credit card accounts) and third-party products offered to Wells Fargo customers.

67.    Specifically, the Independent Report noted that "[s]ales practice concerns also have been implicated with respect to the Community Bank's online insurance referral program. . . . Insurance referrals *did count toward employee incentive compensation goals*[.]"[21] The referral program required little to no underwriting and most premiums were paid via electronic funds transfers from Wells Fargo deposit accounts.[22] Those products were issued by a succession of insurance companies, including American Modern Insurance Group, Inc., Assurant, Inc., Great-West Financial, and Pruco Life Insurance Company ("Prudential"), who advised Wells Fargo that customers complained about being signed up for the insurance products without authorization.[23] The Accusation describes sales tactics contrary to Wells Fargo's agreements with those insurers, which "prohibited [Wells Fargo] employees from being 'involved in sales, solicitation[s] or negotiation[s]'" for the policies.[24] These allegations explain why Plaintiffs and the classes of persons they seek to represent were enrolled in the Unauthorized Products and how this was accomplished by Wells Fargo.

68.    On December 27, 2018, Wells Fargo settled with the CDI. Wells Fargo agreed to a $10,000,000 monetary penalty and $345,816 for the CDI's costs; to pay restitution (which was represented to have already been paid to victims) without prejudice to consumers pursuing their own legal rights; and to voluntarily cease transacting new insurance business in California, and not to do so until its licenses expired on September 30, 2020. Wells Fargo also agreed not to reapply for licenses for a period of not less than two years, and the settlement's terms were made applicable to Wells Fargo's affiliated entities.[25]

69.    Wells Fargo has exhibited a pattern of unfair business practices through its corporate policies and lack of oversight as identified by the OCC in its 2016 and 2018 Consent Orders, the

---

[21] *Id.* at 4.

[22] *Id.*

[23] *Id.* at 5–8 (identifying thousands of victims).

[24] *Id.* at 8.

[25] *See generally* Order Adopting Settlement Agreement, *In re Wells Fargo Bank, N.A.*, No. LA201600665-AP (Cal. Ins. Comm'r Jan. 2, 2019), https://www.insurance.ca.gov/0400-news/0100-press-releases/2019/upload/nr001-19WellsFargoOrder01-02-19fix.pdf.

CFPB's 2022 Consent Order, CFPB Director Rohit Chopra's remarks regarding the 2022 Consent Order, and the CDI. This pattern of corporate greed harmed many consumers, including Plaintiffs and putative Class members.

70.    The claims raised in this complaint, although not addressed in prior class action litigation, seek financial recovery and injunctive relief for Wells Fargo's wrongful conduct that is the product of a corrupt organization and inadequate oversight that historically has rewarded its employees for the same type of unlawful business patterns and practices, and has resulted in Plaintiffs and Class members having their money taken for products and services they did not want.

71.    While similar Wells Fargo business practices of enrolling customers in accounts or products without customer knowledge have been the subject of other class action litigation and related settlements, the specific practices alleged here for the products at issue are different and arise from different factual predicates.

### *Wells Fargo's Misleading and Unfair Notification and Remediation Efforts*

72.    Beginning in late 2023 and continuing in 2024, Wells Fargo sent form notification letters to Plaintiffs and putative Class members informing them that at some point previously they had been enrolled in a particular product. The letters lacked detail, were misleading, and overall, were designed so that consumers were unlikely to respond.

73.    The notification letters generally took the following form:

Dear _____

During a recent review of our current and former customer accounts, our records indicated that you were enrolled in the [name of product]. The enrollment began [date] and ended [date].

**What you need to know**
If you feel that the enrollment in this product was not authorized or not wanted by you, please call us within 60 days of the date of this letter so that we may care for any impact this enrollment may have caused. Otherwise, no action is needed.

**We're here to help**
If you have any questions regarding enrollment in this product, please call us at 1-877-642-7826, Monday through Friday 8:00 a.m. to 8:00 p.m. Central Time. We accept telecommunications relay service calls.

Thank you.

Wells Fargo Customer Care

74.     Wells Fargo's notification letters reached beyond its customer base to consumers who were not accountholders with Wells Fargo but who too were secretly enrolled in these products without their knowledge or consent.

75.     Plaintiffs and putative Class members were sent separate letters for each Unauthorized Product in which they had been enrolled. Plaintiffs and putative Class members also were sent separate letters for each time period they had been wrongfully enrolled in a product or service, if they had been enrolled in the same product on multiple occasions. This resulted in some Plaintiffs and putative Class members receiving multiple letters.

76.     Wells Fargo relies on the oblique nature of the letter to depress claims rates, knowing that many of the letters will be thrown out and/or disregarded without follow up by Plaintiffs and putative Class members initially believing it to be inapplicable to them or a scam.

77.     Indeed, publicly available social media posts and articles from late 2023 and early 2024 indicate that many recipients believed that the notification letter was a scam to try to get personal information, did not trust the letters, and therefore threw them out.[26] Many others also apparently think that Wells Fargo's notification letter is really just a phishing scam or spam.[27]

78.     One consumer posted a picture of one of these letters from Wells Fargo, dated November 15, 2023, to Reddit asking others to weigh in on whether this letter was legitimate or if it was part of a scam.[28]

79.     On November 21, 2023, another consumer posted to Credit Boards noting that they "[j]ust received this same letter today! [D]ifferent dates also but yes from 10 years ago. I HONESTLY don't remember ever banking with Wells [F]argo."[29]

---

[26] *See, e.g.*, Mike Hardy, *Millions Are Getting This Letter From Wells Fargo And Throwing It Away – Don't!*, Medium (Nov. 28, 2023), https://mike-hardy-thumbwind.medium.com/millions-are-getting-this-letter-from-wells-fargo-and-throwing-it-away-dont-it-cou-c012a376274c.
[27] *See, e.g.*, Hillbilly_Elegant, *Letter from Wells Fargo Regarding Identity Theft Protection-Affinion Product*, Reddit (Nov. 22, 2023, 9:50 AM), https://www.reddit.com/r/Scams/comments/181f54u/letter_from_wells_fargo_regarding_identitytheft/.
[28] *Id.*
[29] WillowT, *A Very Special Communication from Wells Fargo . . .* , CreditBoards.com (Nov. 21, 2023, 6:42 PM), https://creditboards.com/forums/index.php?/topic/634914-a-very-special-communication-from-wells-fargo/.

80.    Compounding the problem, and knowing of the confusion, Wells Fargo put nothing on its website confirming the legitimacy of the notification letters or that they would be sent to customers, which makes the letters seem even more suspicious. Instead, and likely in response to a media inquiry, Wells Fargo's Tom Goyda, Senior Vice President for Consumer Lending Communications, stated to the Houston Chronicle:

> While we cannot comment on regulatory matters, we continue to put legacy issues behind us as evidenced from this letter which covers a time period dating back more than one decade ago . . . . If customers have questions about these letters, they can call the toll-free number provided in the letter itself or contact Wells Fargo by calling the number on their account statement or 800-869-3557.[30]

81.    Despite knowing that Plaintiffs and putative Class members did not authorize or want the product at issue, or even know about it, the notification letters do not clearly state:

- That Wells Fargo unilaterally enrolled the recipient in the product without their authorization or knowledge;

- The consumer was charged for the unauthorized product or service;

- The amount of money taken from the recipient for the unauthorized product or service over the enrolled time period; or

- That Wells Fargo is offering financial compensation for recipients of the notification letter.

82.    Instead, Wells Fargo's notification letters use soft and evasive language that downplays Wells Fargo's culpability. For example, the notification letters obliquely state that the recipient can call Wells Fargo to receive "care for any impact th[e] enrollment may have caused" if the recipient "feel[s] that the enrollment . . . was not authorized or not wanted. . . . Otherwise, no action is needed."

83.    Such evasive language in the notification letters, combined with the omissions of Wells Fargo's culpability, the amount taken from recipient for the enrolled product, and that Wells Fargo is offering money in restitution, were intended to, and in fact do, reduce the response rate of the number of Plaintiffs and putative Class members that call Wells Fargo to seek remediation.

---

[30] Erica Grieder, *Wells Fargo is sending checks to some current and former customers. Here's what to know.*, Houston Chronicle (Dec. 27, 2023), https://www.houstonchronicle.com/business/article/what-to-know-about-wells-fargo-checks-18568099.php.

84.     Consistent with the foregoing omissions, the notification letters also omit other useful information to the recipient to conceal Wells Fargo's culpability and reduce response rates. For example, the notification letters may omit:

- The time period in which the recipient had been enrolled in some products and services;
- The identification of third parties that may have underwritten or branded the product or service; or
- The Wells Fargo product, service or account that was related to the enrolled product or service.

85.     Without information about the product or service, consumers have little context for the letter and whether the product or service was something the consumer knowingly enrolled in. Consumers who did not knowingly enroll in the product in the first place are not likely to respond to a vague request to call "so that we may care for any impact."

86.     In addition to the omissions and the vague and misleading language in the notification letters alleged above, Wells Fargo also imposes procedural and administrative burdens on Plaintiffs and putative Class members to reduce response rates and remediation costs in a process that is one-sided and misleading.

87.     The notification letters place the burden on the recipient to respond and state an arbitrarily short 60-day deadline in which the recipient has to contact Wells Fargo to receive "care for any impact th[e] enrollment may have caused."

88.     Those Plaintiffs and putative Class members who did call the 1-877-642-7826 phone number provided in the notification letter did not actually speak with a Wells Fargo employee. Instead, they spoke to an employee of a third-party call-center manned by claims servicer Epiq Systems, Inc. ("Epiq").

89.     The call script utilized by the Epiq employees on Wells Fargo's behalf is further designed to obfuscate Wells Fargo's accountability.

90.     The Wells Fargo call center representatives are unable to provide the amounts taken from the consumer for the unauthorized product or service in which Wells Fargo had enrolled them.

1    Nor can they provide other information about the enrollment, the enrolled products, or any other Wells

2    Fargo products or services they may be related to.

3         91.    Callers to the Wells Fargo Customer Care call center are first asked to acknowledge

4    receipt of the letter and that they did not authorize the product or service identified in the letter they

5    received. For many consumers, the lack of information from Wells Fargo about the product or service

6    leaves them unable to answer either way whether they, in fact, authorized enrollment. Wells Fargo

7    knows the consumer did not enroll in the product or service, but unnecessarily puts the onus on the

8    consumer.

9         92.    If a consumer is able to acknowledge that they had not "authorized" the product or

10    associated charges, customers are then offered a predetermined amount of money. The consumer is

11    provided a monetary amount without first being informed of the total amount of money taken for the

12    unauthorized product or service. The fact that the call center employees can readily determine an exact

13    amount of money to offer consumers that differs among products and enrollment periods demonstrates

14    that Wells Fargo has already determined such amounts. In addition to the preauthorized amount of

15    money, call center employees are directed to offer an additional payment of $250 to callers who

16    express unhappiness with the amount offered. If a caller used trigger words like "attorney" or "Better

17    Business Bureau" or CFPB or suggested they would notify the media, they were live transferred to a

18    Wells Fargo employee and offered additional compensation.

19         93.    That Wells Fargo has calculated specific amounts for each product enrollment period

20    and for each recipient of a notification letter, and has made that information available to call center

21    employees, also evidences that Wells Fargo intentionally left that information out of the notification

22    letters in order to drive down response rates and its remediation costs. Wells Fargo could have stated in

23    the notification letter the dollar amount it was offering to refund consumers, but frequently did not

24    indicate specific refund amounts, or provide any clarity on the actual amount of improper charges.

25         94.    Instead, Wells Fargo continues to obfuscate the details of consumers enrolled in the

26    Unauthorized Products, creating a process for consumers to get their money back that is confusing and

27    puts consumers at a disadvantage.

28

95.     Plaintiffs and putative Class members who have been savvy enough to balk at the amount initially offered by the Wells Fargo representative (*i.e.*, the Epiq call center employee) may then be offered a higher amount of money for the caller to, effectively, go away. However, this second offer has no relationship to the amount of money that was improperly taken from the consumer for the unauthorized product or service.

96.     Plaintiffs and putative Class members who have been savvy enough to reject even the increased amounts offered are then told by the representative that they can "mediate" their claim.

97.     Plaintiffs and putative Class members who inform the Wells Fargo representative that they wish to consider mediation then receive another letter from Wells Fargo. That letter again downplays Wells Fargo's culpability and further shifts the burden to the customer to move forward stating, in part:

> Our records indicate that you contacted Wells Fargo on [date] and expressed concerns that may have been related to an account or service that you did not authorize or did not want. . . .
>
> If you believe that your concerns have not been sufficiently resolved, the mediation process is available to find a solution that's acceptable to both you and Wells Fargo. . . .
>
> We have included a Mediation Request Form for you to complete and return if you choose this option.

98.     The Mediation Request Form again puts the onus on the consumer to provide information about products and services they never knowingly enrolled in and for which Wells Fargo will not provide basic information.

99.     Those Plaintiffs and putative Class members who have pursued mediation have experienced continued obfuscation and unfair business practices by Wells Fargo.

100.    There is no indication from Wells Fargo that any amounts paid to any recipient of its notification letters, including Plaintiffs and putative Class members, constitute a settlement, accord and satisfaction, novation, or offset of any damages arising from Wells Fargo's alleged conduct here and Plaintiffs, on behalf of themselves and the Class members they seek to represent, affirmatively disavow any settlement, accord and satisfaction, novation, or offset of any damages arising from Wells Fargo's alleged conduct here on the basis of their receipt of any monies from Wells Fargo paid pursuant to the notification letters.

1      101.    The magnitude of damages to redress the allegations in this complaint, and the number

2  of affected consumers/putative Class members, are reflected in the fact that, as of December 31, 2023,

3  Wells Fargo still held $819 million in "reserves" for "accrued," "probable and estimable costs related

4  to our customer remediation activities."[31] No doubt a very substantial portion of this $819 million

5  reserve relates to Wells Fargo's "probable and estimable" remediation to Plaintiffs and Class members

6  for the Unauthorized Products that Wells Fargo enrolled them in at issue in this complaint.[32]

*Wells Fargo is Not Entitled to Any Statute of Limitations Defense, or*
*Plaintiffs and Putative Class Members Are Entitled to Equitable Tolling*

     102.    Wells Fargo waived, forfeited, and abandoned statutes of limitations that may be argued

to apply to Plaintiffs' and putative Class members' claims through its actions in writing the letters and

attempting to "care for any impact this enrollment may have caused" to Plaintiffs and putative Class

members due to Wells Fargo's unlawful actions that give rise to this lawsuit.

     103.    Plaintiffs' and putative Class members' causes of action never accrued under the

discovery rule or are tolled under equitable doctrines so that their claims are timely. Plaintiffs and

putative Class members were not contemporaneously notified of their enrollment in the Unauthorized

Products.

     104.    For some products, the often relatively modest charges associated with the product were

bundled into authorized periodic loan payments, and thus Plaintiffs could not have through reasonable

efforts uncovered the charges. For other products, the charges were billed separately, but without

sufficient detail to describe what service was being provided. Even if a consumer, scrutinizing a

monthly ledger, could have uncovered the charge, they would have had no way of knowing Wells

Fargo's role in enrolling the consumer in the product. Thus, Plaintiffs and putative Class members

could not have known, through reasonable efforts, the facts that give rise to their claims against Wells

Fargo.

---

[31] Wells Fargo & Company, Annual Report at PDF pp. 14, 148 (2023), https://www.wellsfargo.com/assets/pdf/about/investor-relations/annual-reports/2023-annual-report.pdf.

[32] *See id.* at PDF p. 22 (indicating that the year-end 2023 reserve of $819 million no longer included amounts for "historical mortgage lending, automobile lending, and consumer deposit accounts matters"—as consumers affected by those matters have already been remediated).

105.    Plaintiffs and putative Class members first learned they were enrolled in the products or services when they received the notification letters from Wells Fargo in late 2023 or 2024. Prior to receiving the notification letters, Wells Fargo had not informed Plaintiffs and putative Class members that they had been enrolled in the Unauthorized Products by Wells Fargo, and Plaintiffs and putative Class members could not have reasonably known that this had occurred.

106.    As detailed below, certain Plaintiffs retained copies of statements from their period of enrollment and could not determine from these statements that they had been enrolled in the products, let alone enrolled by Wells Fargo.

107.    Many Plaintiffs have been unable to access monthly account statements from the time of their enrollment in the Unauthorized Products, as they are no longer Wells Fargo customers or cannot access records dating back further than seven years. However, their practice was to regularly review their monthly statements, and they did not learn of their enrollment at the time. They do not recall ever seeing these products reflected on their bank statements. They also do not recall ever receiving any information indicating to them that they had been enrolled in the Unauthorized Products by Wells Fargo.

108.    Despite their diligence, Plaintiffs could not have discovered their enrollment in the Unauthorized Products earlier because Wells Fargo never informed them they had been enrolled in the products, and their Wells Fargo bank statements did not provide any information from which they could have determined that they had been enrolled in the products. It remains a mystery to Plaintiffs how they were enrolled, as well as when and how much they were charged for the products.

109.    The remediation letters and subsequent phone calls regarding the Unauthorized Products did not reveal any details regarding the amounts, frequency, or dates of the charges for these products. Plaintiffs have no way of knowing if they were only charged once for a product without their consent, or if they were charged routinely, and where, if it all, they would have been able to review the charges.

110.    Whether due to misleading labeling of the charges, the small amounts charged, the bundling of the charges into escrow or other regularly scheduled payments, or a failure to accurately reflect the charges, Class members were not able to discover that they had been enrolled in the

Unauthorized Products by Wells Fargo during their period of enrollment. After receiving remediation letters from Wells Fargo, Plaintiffs searched statements and records in their possession that related to their periods of enrollment, and were unable to identify what, if any, line items were associated with the products.

111. Wells Fargo's failure to provide its customers with the information Wells Fargo had already collected and given to the call center vendor detailing the total amounts taken from Wells Fargo's customers by Wells Fargo and Unauthorized Product vendors or the basis on which those amounts were calculated further obfuscates the Plaintiffs' attempts to review their records.

112. Some Plaintiffs, with the benefit of hindsight, have been able to speculate that some line items may potentially be associated with the Unauthorized Products. However, because of the misleading nature of the remediation program, they cannot confirm whether those line items are in fact associated with the Unauthorized Products identified in the remediation letters. Moreover, until they received the remediation letters, none of these Plaintiffs had reason to know of Wells Fargo's role in their enrollment in the Unauthorized Products. Thus, as to Wells Fargo, they had no reason to suspect the facts giving rise to the claims until receipt of the remediation letters.

113. Without the benefit of discovery, Plaintiffs lack detailed information specific to each of them regarding when and how Wells Fargo enrolled them in Unauthorized Products, and how and what they were charged as a result of their enrollment in the Unauthorized Products. Wells Fargo did not provide Plaintiffs with this information at the time Plaintiffs were enrolled by Wells Fargo in Unauthorized Products, and to this day has not provided Plaintiffs with this information. Wells Fargo, on the other hand, knows exactly when and how each Plaintiff was enrolled, and what, when and how each Plaintiff was charged for the Unauthorized Products. This information is exclusively in the possession of Wells Fargo. Plaintiffs have alleged all the facts that are known to them at this time regarding their enrollment in the Unauthorized Products.

114. Wells Fargo cannot deny that it possesses detailed information regarding the who, what, when, and why of the Plaintiffs' enrollment in the Unauthorized Products, as Wells Fargo relies on much of this information in its (flawed) remediation program. On information and belief, Wells Fargo has withheld this information with full knowledge that doing so has deprived and continues to deprive

1    Plaintiffs and the Class of persons they seek to represent with critical details of Wells Fargo's unfair

2    practice of enrolling consumers in the Unauthorized Products.

*Wells Fargo's Conduct Toward the Named Plaintiffs*

**Plaintiff Amanda Gonzales**

5    115.    Plaintiff Gonzales started her career as a schoolteacher in 2009 and opened a checking

6    account and a savings account with Wells Fargo to enable her to receive automatic deposit of her

7    paychecks. Much later, Plaintiff Gonzales opened a credit card account with Wells Fargo. Plaintiff

8    Gonzales is a current Wells Fargo customer.

9    116.    On February 5, 2024, Wells Fargo sent a letter to Plaintiff Gonzales informing her that

10   Wells Fargo's records indicated that she had been "enrolled" in an "Accidental Death" product from

11   May 26, 2009 – December 25, 2022.

12   117.    Plaintiff Gonzales never approved of, never wanted, and never knew about her

13   enrollment by Wells Fargo in the Accidental Death product. During the time of enrollment, Plaintiff

14   Gonzales regularly reviewed her periodic account statements and never learned of her enrollment.

15   118.    Plaintiff Gonzales initially thought the letter could be a scam, so she conducted an

16   investigation, including speaking with representatives at the phone number listed in the letter, calling

17   the phone number on the back of her bank card, and speaking in person with a teller at her local Wells

18   Fargo branch bank.

19   119.    On or about February 19, 2024, Plaintiff Gonzales called the phone number listed in the

20   letter and spoke with a representative. Plaintiff Gonzales asked questions to try to learn details about

21   the Accidental Death product (which she had never heard of before), and the total amount of money

22   Wells Fargo had taken from Plaintiff Gonzales in the scheme. The representative was unable or

23   unwilling to answer Plaintiff Gonzales's questions.

24   120.    Plaintiff Gonzales's call was then transferred by the representative to "escalations"

25   where Plaintiff Gonzales repeated her questions to try to understand what she had paid for, the nature

26   of the Accidental Death product, the purported death benefit, and whether the letter was really just a

27   phishing attempt. Without answering the questions, the escalations representative said that her

28   computer system was not working and then transferred Plaintiff Gonzales to another person. Plaintiff

Gonzales asked the third representative the same questions, and this representative said that she cannot give that information and that they do not have this information because they are a third party and are not Wells Fargo.

121.    Plaintiff Gonzales visited her Wells Fargo branch bank on or about February 20, 2024, and was unable to learn any additional information because, according to the branch bank teller she spoke with, the branch had no ability to access the requested corporate information.

122.    Shortly after visiting the bank branch, Plaintiff Gonzales called the Wells Fargo customer service phone number (on or about February 20, 2024) on the back of her bank card. The Wells Fargo representative who answered the call informed Plaintiff Gonzales that the letter was valid and that Wells Fargo was notifying affected customers about its prior conduct. Then, the representative transferred Plaintiff back to the third-party that she originally had spoken to.

123.    Plaintiff Gonzales was frustrated with the lack of information given to her by Wells Fargo and the third-party representatives acting on behalf of Wells Fargo, so she conducted an investigation of her own records to search for anything related to the Accidental Death product in which she was enrolled.

124.    Despite asking Wells Fargo for copies of her bank statements, Wells Fargo was unwilling or unable to provide her with access to any statements dated earlier than 2017. In fact, the representative advised Plaintiff Gonzales that Wells Fargo was only legally obligated to retain records for seven years and denied the ability to send Plaintiff Gonzales bank statements prior to 2017.

125.    Plaintiff Gonzales performed a diligent search of her bank statements from 2017 until 2024, and did not find anything related to the Accidental Death product.

126.    On or about June 5, 2024, Plaintiff Gonzales, through counsel, sent a subpoena to the third-party vendor who allegedly partnered with Wells Fargo to administer the Accidental Death product. Documents in response to that subpoena were received on October 16, 2024.

127.    The third-party discovery included an enrollment form for Accidental Death Insurance, issued by Monumental Life Insurance Company, that was allegedly signed and dated by Plaintiff Gonzales on May 19, 2009. The enrollment form listed Plaintiff Gonzales' mother as a beneficiary.

128.    The third-party discovery also included a letter that was allegedly sent to Plaintiff Gonzales on May 27, 2009 confirming written authorization to have insurance premiums billed directly to a bank account number ending in 4584.

129.    Plaintiff Gonzales reviewed these documents and denied having completed or signed the enrollment form for Accidental Death Insurance with Monumental Life Insurance Company. In fact, Plaintiff Gonzales denied any knowledge of, or relationship with Monumental Life Insurance Company whatsoever. Furthermore, Plaintiff Gonzales does not have a bank account that ends in 4584.

130.    Since the opening of her account with Wells Fargo in 2009, Plaintiff Gonzales has contacted Wells Fargo on more than one occasion to dispute unauthorized /or erroneous charges. Had Plaintiff Gonzales observed a recurring charge on her monthly account statements for an add-on product that she did not authorize, such as Accidental Death, she would have immediately contacted Wells Fargo to dispute the charge.

131.    Wells Fargo unilaterally discontinued Plaintiff Gonzales' enrollment in the product without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knew that Plaintiff Gonzales did not authorize this enrollment.

132.    Wells Fargo unfairly placed the onus on Plaintiff Gonzales to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Gonzales (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollments.

### **Plaintiff Matt Huber**

133.    Plaintiff Huber opened a checking and savings account with Wells Fargo in 2004 and is a current Wells Fargo customer.

134.    On November 18, 2023, Wells Fargo sent Plaintiff Huber a letter notifying him that he had been "enrolled" in the "Identity Theft Protection – Affinion" product. No dates for the enrollment period were provided by Wells Fargo.

135.    On November 29, 2023, Plaintiff Huber received a second letter from Wells Fargo notifying him that he had been "enrolled" in the "Credit Defense" product from April 9, 2010 through June 15, 2018.

136.     On December 1, 2023, Plaintiff Huber received a third letter from Wells Fargo notifying him that he had been "enrolled" in the "Identity Theft Protection – Affinion product." No dates for the enrollment period were provided by Wells Fargo.

137.     Plaintiff Huber never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Identity Theft Protection or Credit Defense products.

138.     Plaintiff Huber was only able to access his checking account statements from 2017 to 2024 and credit card statements from 2022 to 2024.

139.     Plaintiff Huber performed a diligent search of his account statements from 2017 until 2024, and observed a total of three charges on August 3, 2017, August 3, 2018, and March 4, 2019 for "Tlg*Idprot53352257" in the amount of $12.99.

140.     As he was reviewing these charges, Plaintiff Huber had no previous knowledge of what "Tlg*Idprot533252257" was and still does not know. A google search using "Tlg*Idprot533252257" as a search term reveals no publicly available information as to the specific service from which this charge stemmed.[33]

141.     The charges appear unrelated to the Credit Defense product that Plaintiff Huber was enrolled in as two out of the three charges were processed after the alleged enrollment period of April 9, 2010 through June 15, 2018, and none of the charges allude to Credit Defense.

142.     Plaintiff Huber regularly reviews his monthly statements and does not recall a charge related to his Unauthorized Products on any previous statements. Had Plaintiff Huber noticed a suspicious charge on his account statement, he would have disputed the charge.

143.     Plaintiff Huber is certain he would not have signed up for Identity Theft Protection and/or Credit Defense with Wells Fargo or any company, as he did not have extra money to spend on add-on products or services.

144.     Wells Fargo unilaterally discontinued his enrollment in the products without notifying him first or obtaining his authorization to terminate his enrollments. This indicates that Wells Fargo knew Plaintiff Huber never authorized these "enrollments."

---

[33] Google, Inc., http://www.google.com (search for "Tlg*Idprot533252257") (last searched Nov. 26, 2024).

145.    Wells Fargo unfairly placed the onus on Plaintiff Huber to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Huber (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollments.

**Plaintiffs Christopher Barker & Nazia Barker**

146.    Plaintiffs Christopher Barker and Nazia Barker (collectively, the "Barker Plaintiffs"), maintained a checking account with Wells Fargo for many years and also had a mortgage with Wells Fargo.

147.    On December 1 and December 2, 2023, Wells Fargo sent separate letters to Plaintiff Christopher Barker ("C. Barker") notifying him in each letter that he had been "enrolled" in the "Identity Theft Protection – Affinion" product. No dates for the enrollment period were provided by Wells Fargo in either letter.

148.    On December 6, 2023, Wells Fargo sent another letter to Plaintiff C. Barker notifying him that he had been "enrolled" in the "Identity Theft Protection – Affinion" product for the period June 16, 2011 through August 6, 2012.

149.    Plaintiff C. Barker never approved of, never wanted, and never knew about his enrollments by Wells Fargo in the Identity Theft Protection – Affinion product.

150.    On May 22, 2024, Wells Fargo sent a letter to Plaintiff N. Barker ("N. Barker") notifying her that she had been "enrolled" in the "Preferred" product for the period October 29, 2008 through March 6, 2009.

151.    Plaintiff N. Barker never approved of, never wanted, and never knew about her enrollment by Wells Fargo in the Preferred product.

152.    The Barker Plaintiffs called the telephone number provided in the letters sent to them and spoke with a representative. During the call, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of the Barker Plaintiffs into these products.

153.    Frustrated with the lack of information from Wells Fargo, and the third-party representatives acting on behalf of Wells Fargo, the Barker Plaintiffs conducted an investigation of their own records to search for anything related to the Preferred product in which they were enrolled.

154.    Plaintiff N. Barker was able to access an email account she used during the only enrollment period that Wells Fargo disclosed (*i.e.* from October 29, 2008 through March 6, 2009.) Using the search term "preferred," the search of her email account did not reveal anything related to a Preferred product.

155.    The Barker Plaintiffs regularly review their monthly statements and do not recall a charge related to their Unauthorized Products on any previous statements. Had the Barker Plaintiffs noticed a suspicious charge on their account statement, they would have disputed the charge.

156.    The Barker Plaintiffs know with certainty that they would not have signed up for these products, with Wells Fargo or any company, as they did not have extra money to spend on add-on products or services. Furthermore, they do not recall any charge relating to either of those products on previous mortgage or bank account statements.

157.    Wells Fargo unilaterally discontinued the Barker Plaintiffs' enrollment in the product without notifying them first or obtaining their authorization to terminate their enrollment. This indicates that Wells Fargo knew that the Barker Plaintiffs never authorized these enrollments.

158.    Furthermore, Wells Fargo unfairly placed the onus on the Barker Plaintiffs to contact Wells Fargo if they felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which the Barker Plaintiffs (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

### **Plaintiff Calvin Boyd**

159.    In early December 2023, Plaintiff Boyd received a letter from Wells Fargo advising that he had been "enrolled" in an "Identity Theft Protection – Affinion" insurance product from October 8, 2007 through May 27, 2008. He contacted Wells Fargo in January 2024 about this letter and requested a refund, stating that he did not ever authorize or want this product.

160.    Plaintiff Boyd subsequently received two more letters from Wells Fargo in February 2024 indicating that he also had been "enrolled" in a "Home Warranty" insurance product from

December 31, 2007, through December 31, 2008, and an "Accidental Death" insurance product from January 1, 2011, through April 1, 2015. Plaintiff Boyd contacted Wells Fargo on February 28, 2024, and March 5, 2024, respectively, stating that he did not ever authorize or want these products either.

161.    Plaintiff Boyd never approved of, never wanted, and never knew about his enrollment by Wells Fargo in any of the products that Wells Fargo had notified him about. In fact, during the time periods for which he was enrolled, Plaintiff Boyd owned a residential and commercial construction company and he would have had no need for a home warranty product and certainly did not authorize one. Nor did he need, or authorize, an accidental death insurance product because his parents already had life insurance policies on him. Plaintiff Boyd also had no need for, or authorize, any identity theft protection because, at that time, it was not a concern to him. More importantly, during this time frame Plaintiff Boyd did not have extra money for insurance products and would not have ordered them knowingly. Plaintiff Boyd also would not have signed up for any free trial periods and he typically throws out any marketing materials for insurance products. Had Plaintiff Boyd noticed on any of his bank statements that Wells Fargo was charging him for any of these products, he would have called Wells Fargo to cancel them.

162.    Plaintiff Boyd regularly reviews his monthly statements and does not recall a charge related to his Unauthorized Products on any previous statements. Had Plaintiff Boyd noticed a suspicious charge on his account statement, he would have disputed the charge.

163.    Plaintiff Boyd reviewed a few old bank and mortgage statements that he had from Wells Fargo, but he could not identify any indication on those statements for charges for any of the products that Wells Fargo told him that he was enrolled in without his knowledge or authorization. Indeed, one mortgage statement he was able to find from 2010 has a line entry showing "0" for "optional products." Had Plaintiff Boyed ever seen on any of his statements that he was being charged for products he did not authorize, he immediately would have called Wells Fargo to cancel them because he neither needed, wanted, nor could have afforded, any such products at the time. Plaintiff Boyd is concerned, however, because he had an adjustable rate mortgage that Wells Fargo serviced and any unknown product charges could have been imbedded in his mortgage statement and concealed because his mortgage payments adjusted from time to time as interest rates changed.

164.    Wells Fargo unilaterally discontinued Plaintiff Boyd's enrollment in the products without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knew that Plaintiff Boyd never authorized his enrollments.

165.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Boyd to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Boyd (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff Joseph Young**

166.    Plaintiff Young never had a checking or savings account, credit card, car loan, mortgage loan, or any other type of financial relationship with Wells Fargo at any time.

167.    On February 26, 2024, Wells Fargo sent a letter to Plaintiff Young notifying him that he had been "enrolled" in the "Hospital Accident" product from February 1, 2008, through May 31, 2008.

168.    Plaintiff Young never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Hospital Accident product.

169.    Following his receipt of the letter from Wells Fargo, Plaintiff Young called the telephone number provided on the letter and spoke with a representative who informed him that the Hospital Accident product consisted of a "checking account package offering benefits such as a $10,000 accidental death insurance, purchase protection, an extensive warranty RX Advantage prescription drug program, a car rental discount, banking benefits including free money orders and check cashier checks and free or discounted Wells Fargo's checks."

170.    During the call, Plaintiff Young relayed to the representative that he didn't recall ever having an account with Wells Fargo and asked how he could have signed up for a checking account package with Wells Fargo when he had no prior relationship with Wells Fargo.

171.    Plaintiff Young requested validation that he authorized the opening of an account. He was placed on a brief hold before the representative advised him that a Wells Fargo team member may have opened the account and if that is indeed what happened, the Wells Fargo team member was acting outside of the policy.

172.    Plaintiff Young voiced his frustration and concern in trying to understand how Wells Fargo could have accessed any of his information considering the absence of a relationship between the two. In response, the representative transferred Plaintiff Young to an escalations agent.

173.    In total, Plaintiff Young spoke to nine separate individuals during his call with the escalations agent, and not a single one of them could disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Young into the Hospital Accident product.

174.    Plaintiff Young regularly reviews his monthly statements and does not recall a charge related to his Unauthorized Product on any previous statements. Had Plaintiff Young noticed a suspicious charge on his account statement, he would have disputed the charge.

175.    Plaintiff Young did not sign up for an add-on product or service with Wells Fargo and still cannot ascertain how Wells Fargo would have accessed his personal information.

176.    Wells Fargo unilaterally discontinued Plaintiff Young's enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knew that Plaintiff Young never authorized this enrollment.

177.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Young to contact Wells Fargo if he felt that the enrollment in this product was not authorized or not wanted. Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Young (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff Alcira Rocha**

178.    Plaintiff Rocha opened a checking account with Wells Fargo in 2004 to enable herself to receive Social Security direct deposits. She is a current Wells Fargo customer.

179.    In January 2024, Wells Fargo sent a letter to Plaintiff Rocha notifying her that she had been "enrolled" in an "Accidental Death" product from May 1, 2009 through August 1, 2009.

180.    Plaintiff Rocha never approved of, never wanted, and never knew about her enrollment by Wells Fargo in the Accidental Death product.

181.    On February 23, 2024, Wells Fargo sent a letter to Plaintiff Rocha notifying her that she had been "enrolled" in the "Health Discount/Best Benefits Plan" product from March 23, 2009, through June 5, 2009.

182.    Plaintiff Rocha never approved of, never wanted, and never knew about her enrollment by Wells Fargo in the Health Discount/Best Benefits Plan product.

183.    Following her receipt of the letters from Wells Fargo, Plaintiff Rocha called the phone number listed in the letter and spoke with a representative. Plaintiff Rocha asked questions to try to learn details about the Accidental Death and Health Discount/Best Benefits Plan products, which she had never heard of before, and the total amount of money Wells Fargo had taken from her to pay for them. The representative was unable or unwilling to answer Plaintiff Rocha's questions and made attempts to circumvent Plaintiff Rocha's questions by transferring the call to an unanswered line.

184.    Thereafter, Plaintiff Rocha visited her Wells Fargo bank branch but was unable to learn any additional information.

185.    Plaintiff Rocha was frustrated with the lack of information from Wells Fargo and the third-party representatives acting on behalf of Wells Fargo, so she conducted an investigation of her own records to search for anything related to the Accidental Death or Health Discount/Best Benefits Plan products in which she was enrolled.

186.    Despite asking Wells Fargo for copies of her bank statements, Wells Fargo was unwilling or unable to provide her with access to any statements dated earlier than 2017. In fact, the representative advised Plaintiff Rocha that Wells Fargo was only legally obligated to retain records for seven years and denied the ability to send Plaintiff Rocha bank statements prior to 2017.

187.    On or about June 4, 2024, Plaintiff Rocha, through counsel, sent a subpoena to the third-party vendor who allegedly partnered with Wells Fargo to administer the Accidental Death product. Documents in response to that subpoena were received on October 16, 2024.

188.    The third-party discovery included two enrollment forms for Accidental Death Insurance issued by Monumental Life Insurance Company. The first enrollment form was allegedly signed and dated by "Alicira Grijalva" on May 4, 2006 and lists Plaintiff's husband as a beneficiary. The second enrollment form was allegedly signed and dated by "Alcira Rocha" on April 8, 2009 and lists Plaintiff Rocha's children as the beneficiaries.

189.    The third-party discovery also included a Schedule of Benefits which listed "National Financial Inst Group Ins Trust" as the policy holder, "Wells Fargo Bank, N.A." as the participating organization, and an effective date of May 1, 2009.

190.    Plaintiff Rocha reviewed these documents and denies having completed or signed the enrollment forms for Accidental Death Insurance with Monumental Life Insurance Company. In reviewing the Accidental Death enrollment form purportedly signed on May 4, 2006, Plaintiff Rocha did not recognize the signature on the form as being hers as she does not recall her signature ever being that legible. In reviewing the Group Accidental Death Insurance enrollment form purportedly signed on April 8, 2009, Plaintiff Rocha did not recognize the signature on the form as being hers as she does not recall ever signing any document with her first, middle and last names. In fact, Plaintiff Rocha denied any knowledge of or relationship with Monumental Life Insurance Company whatsoever.

191.    Plaintiff Rocha regularly reviews her monthly statements and does not recall a charge related to her Unauthorized Product on any previous statements. Had Plaintiff Rocha noticed a suspicious charge on her account statement, she would have disputed the charge.

192.    Plaintiff Rocha lives on Social Security disability and has for decades. She struggled financially during the alleged enrollment period and still accounts for every dollar today. She never would have sought out an add-on product of any kind because she simply did not have means to afford it. Had Plaintiff Rocha observed a charge on her monthly account statements for an add-on product, such as Accidental Death, that she did not authorize, she would have immediately contacted Wells Fargo to dispute the charge.

193.    Wells Fargo unilaterally discontinued her enrollment in the products without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knew Plaintiff Rocha never authorized these "enrollments."

194.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Rocha to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Rocha (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollments.

**Plaintiff Claudia Martinez**

195.    Plaintiff Martinez held checking and savings accounts with Wells Fargo for approximately ten years, opened some time in 2008-2009 and closed around 2019. Although Plaintiff Martinez closed the accounts, she continued to receive account statements until they eventually stopped around 2021.

196.    On February 2, 2024, Wells Fargo sent a letter to Plaintiff Martinez notifying her that she had been "enrolled in the Unemployment product" for the period July 18, 2011 through October 31, 2019.

197.    Plaintiff Martinez was surprised to receive the February 2, 2024, communication from Wells Fargo because she had not been a Wells Fargo customer for many years and never consented to receive the Unemployment product referenced in the letter.

198.    Plaintiff Martinez never approved of, never wanted, and never knew about her enrollment by Wells Fargo in the Unemployment product until Wells Fargo had notified her about it in the letter.

199.    Several weeks later, Plaintiff Martinez called the number listed on the February 2, 2024 letter from Wells Fargo. The representative who answered the call informed Plaintiff Martinez that she received the February 2, 2024 letter because she was enrolled in the Unemployment product, and asked Plaintiff Martinez if she authorized the product enrollment. Plaintiff Martinez informed the representative that she had not authorized the enrollment.

200.    The representative informed Plaintiff Martinez that she was entitled to a check from Wells Fargo in the amount of approximately $3,750. Plaintiff Martinez expressed dissatisfaction with that amount and was offered an additional $250. Plaintiff Martinez later received a check for $4,020.62.

201.    Plaintiff Martinez has reviewed an account statement from the purported enrollment period. There is no mention of the Unemployment product in the statement.

202.    Plaintiff Martinez is certain she never spoke with anyone from Wells Fargo regarding the Unemployment product until after she received the February 2024 letter.

203.    Plaintiff Martinez is certain that she would not have signed up for the Unemployment product because during the alleged enrollment period, Plaintiff Martinez was a single mother who raised five children on her own after her husband passed away in 2011. She did not have extra money to spend on add-on products or services. In 2013, she actually received unemployment compensation from the State of California. If she would have known about her enrollment in the Wells Fargo Unemployment product, she would have filed a claim.

204.    Furthermore, Plaintiff Martinez regularly checked her monthly account statements but never saw anything that seemed out of place, and she certainly did not see anything related to the Unemployment product in which she was enrolled. Had she observed anything of the sort, she would have immediately contacted Wells Fargo to dispute the charges. In fact, Plaintiff Martinez had contacted Wells Fargo numerous times in the past to dispute non-sufficient funds fees, which is ultimately the reason why she closed her Wells Fargo accounts.

205.    To date, Plaintiff Martinez is still unaware of the amount she was charged for the Unemployment product, why she was enrolled in the Unemployment product, and whether Wells Fargo had enrolled her in other products or opened other accounts without her knowledge or consent.

206.    Wells Fargo unilaterally discontinued her enrollment in the product without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knows that Plaintiff Martinez never authorized her "enrollment" in the Unemployment product.

207.    Wells Fargo unfairly placed the onus on Plaintiff Martinez to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Martinez (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff Winfred "Mo" Thomas**

208.    In early February 2024, Plaintiff Thomas received four letters from Wells Fargo dated January 31, 2024, indicating that he had been "enrolled" in a "Sign/Drive Bonus" product from January 10, 2008 through August 8, 2008; an "Income Protector Plus" product from February 5, 2008 through July 6, 2008; another "Income Protector Plus" product from March 20, 2008 through July 6, 2008; and a "Health Protector Bonus" product from March 21, 2008 through July 6, 2008.

209.    During the time period that Plaintiff Thomas was purportedly enrolled in the various products, he was on disability and received insurance coverage through the Veterans Administration. He would not have purchased any of the products Wells Fargo identified because he did not have the extra money to do so, even if he wanted to buy such products. Indeed, shortly after Wells Fargo took over the servicing of his Wachovia mortgage, after Wells Fargo and Wachovia merged in 2008, Plaintiff Thomas got a call from a Wells Fargo representative asking him if he wanted an accidental death insurance product. Plaintiff Thomas made clear to the representative that he did not want it, that he did not need it, and that his wife was not working at the time so they could not even afford it.

210.    Plaintiff Thomas recalls that at one point he noticed on his monthly statement that Wells Fargo had charged him $1.99 for some kind of a death benefit product. When he learned at the time that Wells Fargo had tried to impose the product on him, he called Wells Fargo and demanded his money back.

211.    Plaintiff Thomas ignores free trial periods, because he knows he will be charged when those periods end. His practice is now, and always has been, to throw away or burn any marketing materials he receives in the mail.

212.    Plaintiff Thomas initially thought the notification letters regarding unauthorized product enrollments were a phishing scheme, and Plaintiff Thomas may have thrown out other notification letters he received from Wells Fargo for other Unauthorized Products. Plaintiff Thomas had diligently tried looking through his old records, but he could not find anything and did not have many of his old bank statements. He asked the Wells Fargo representative if Wells Fargo had enrolled him in any products other than the ones in identified in the notification letters he still had. The Wells Fargo representative indicated that he did not know if there were other products.

213.    Plaintiff Thomas never approved of, never wanted, and never knew about his enrollment by Wells Fargo in any of the products that Wells Fargo had notified him about. During the time period Wells Fargo apparently enrolled Plaintiff Thomas in the various products, he was on disability and received insurance coverage through the Veterans Administration. He would not have purchased any of the products Wells Fargo identified because he did not have the extra money to do so, even if he wanted to buy such products, which he did not. Indeed, shortly after Wells Fargo took

over the servicing of his Wachovia mortgage—after Wells Fargo and Wachovia merged in 2008—Plaintiff Thomas got a call from a Wells Fargo representative asking him if he wanted an accidental death insurance product. Plaintiff Thomas made clear to the representative that he did not want it, that he did not need it, and that his wife was not working at the time so they could not even afford it. Plaintiff Thomas recalls that at one point he noticed on his monthly statement that Wells Fargo had charged him $1.99 for some kind of a death benefit product. When he learned at the time that Wells Fargo had tried to impose the product on him, he called Wells Fargo and demanded his money back. At that time, and even today, Plaintiff Thomas has a habit or regularly and carefully reviewing each of his monthly bank statements and billing statements. He always calls to remove and/or get credit for any charge he did not authorize. Plaintiff Thomas also ignores free trial periods, because he knows he will be charged when those periods end. His practice is now, and always has been, to throw away or burn any marketing materials he receives in the mail.

214.    In mid-February 2024, Plaintiff Thomas called the "Wells Fargo's Customer Care" number that Wells Fargo had provided in the letters. Plaintiff Thomas believes that the call was on a recorded line. The representative he spoke to confirmed that Plaintiff Thomas had been enrolled in each of these products by Wells Fargo without his consent. Plaintiff Thomas diligently tried looking through his old records again, but could not find anything and did not have many of his old bank statements. He asked the Wells Fargo representative if Wells Fargo had enrolled him in any products other than the ones in the notification letters he still had, because he did not want to be charged for them and did not have his old bank statements to review. The Wells Fargo representative indicated that he did not know if Plaintiff Thomas was enrolled in other products.

215.    During the call, the Wells Fargo representative offered some financial compensation to Plaintiff Thomas, but such amounts are inadequate to resolve Plaintiff Thomas' damages.

216.    Wells Fargo unilaterally discontinued Plaintiff Thomas' enrollment in the products without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knows Plaintiff Thomas never authorized his enrollment in the various products.

217.    Wells Fargo unfairly placed the onus on Plaintiff Thomas to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed

1    an arbitrary 60-day deadline in which Plaintiff Thomas (and putative Class members) had to raise a

2    dispute with Wells Fargo regarding the product enrollment.

3    **Plaintiff Basil Higgs**

4    218.    Plaintiff Higgs was sent a letter by Wells Fargo dated February 1, 2024, which stated

5    that he had been "enrolled" in the "Income Protector Plus" product for the period March 5, 2007

6    through March 27, 2007.

7    219.    Plaintiff Higgs was surprised to receive this communication from Wells Fargo because

8    he never consented to receive the Income Protector Plus product referenced in the letter.

9    220.    Plaintiff Higgs never approved of, never wanted, and never knew about his enrollment

10    by Wells Fargo in the Income Protector Plus product until Wells Fargo had notified him about it in the

11    letter.

12    221.    A week later, Plaintiff Higgs called the phone number provided by Wells Fargo in the

13    letter (*i.e.*, 1-877-642-7826). The representative who answered the call informed Plaintiff Higgs that he

14    received the February 1, 2024, letter because he had been enrolled in the Income Protector Plus

15    product. The representative could not provide any other information about the product enrollment.

16    222.    The representative told Plaintiff Higgs that a check would be sent to him along with a

17    document for his signature. The representative stated he did not possess further details but could try

18    connecting Plaintiff Higgs to someone at Wells Fargo. Frustrated with the non-answers, Plaintiff Higgs

19    declined to speak with an additional representative as he felt it would not be useful.

20    223.    Plaintiff Higgs was issued a $47.86 check that he did not cash.

21    224.    Plaintiff Higgs remains unaware of the amount he was charged by Wells Fargo for the

22    Income Protector Plus product, why he was enrolled in the Income Protector Plus product without his

23    knowledge and authorization, or whether Wells Fargo opened other accounts or charged him for other

24    products without his knowledge or consent.

25    225.    Plaintiff Higgs searched through his documents and could not find any information

26    related to the Income Protector Plus product. He never had a conversation with anyone from Wells

27    Fargo or a third party regarding the product, and he certainly did not provide permission for his

28    enrollment.

226.    Plaintiff Higgs does not recall ever identifying any charge related to his Unauthorized Product on any previous statements that he reviewed. Had Plaintiff Higgs noticed a suspicious charge on his account statement, he would have disputed the charge.

227.    Plaintiff Higgs closed his account with Wells Fargo sometime between 2010-2012 and he no longer has access to those bank records.

228.    Wells Fargo unilaterally discontinued Plaintiff Higgs' enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment. This indicates Wells Fargo knows Plaintiff Higgs never authorized his enrollment in the product.

229.    Wells Fargo unfairly placed the onus on Plaintiff Higgs to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Higgs (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

### Plaintiff Chad Nicholson

230.    Plaintiff Nicholson was sent a letter by Wells Fargo, dated January 30, 2024, stating that he had been "enrolled" in the "Disaster Mortgage" product for the period August 10, 2007 through October 1, 2007. Plaintiff Nicholson was sent another letter, dated February 15, 2024, stating that he had been "enrolled" in the "Income Protector Plus" product for the period January 26, 2009 through February 18, 2009.

231.    Plaintiff Nicholson was surprised to receive the communications from Wells Fargo because he never consented to receive the Disaster Mortgage or Income Protector Plus products referenced in the letters.

232.    Plaintiff Nicholson never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Disaster Mortgage or Income Protector Plus products until Wells Fargo had notified him about them in the letters.

233.    Several weeks later, Plaintiff Nicholson called the number listed on the January 30, 2024 letter from Wells Fargo (*i.e.*, 1-877-642-7826). The representative who answered the call could not give Plaintiff Nicholson additional information about the Disaster Mortgage or Income Protector Plus products, but stated that Plaintiff Nicholson received the letters because he was enrolled in the

1  products. The representative indicated that Plaintiff Nicholson was entitled to receive a check from
2  Wells Fargo in the amount of approximately $200. Plaintiff Nicholson asked directly if he was sent the
3  letter and offered compensation so he would not sue for this account opened without his knowledge or
4  consent, and he was told "yes."

5       234.    Plaintiff Nicholson received checks totaling roughly $142 for the unauthorized
6  enrollment in both the Income Protector Plus and Disaster Mortgage products. Plaintiff Nicholson did
7  not cash the checks or further communicate with Wells Fargo.

8       235.    Plaintiff Nicholson searched for records from the purported enrollment period but was
9  unable to find any as his Wells Fargo account records only go back seven years. Plaintiff Nicholson
10 has been unable to locate any physical or electronic records related to the Disaster Mortgage or Income
11 Protector Plus products.

12      236.    Plaintiff Nicholson regularly reviews his monthly statements and does not recall ever
13 seeing anything related to the Disaster Mortgage or Income Protector Plus products on his account
14 statements, or speaking with anyone at Wells Fargo about the products. He is certain he never
15 intentionally enrolled in the product. Had Plaintiff Nicholson noticed a suspicious charge on his
16 account statement, he would have disputed the charge.

17      237.    Wells Fargo unilaterally discontinued Plaintiff Nicholson's enrollment in the products
18 without notifying him first or obtaining his authorization to terminate his enrollment. This indicates
19 that Wells Fargo knew Plaintiff Nicholson never authorized his enrollment in the products.

20      238.    Wells Fargo unfairly placed the onus on Plaintiff Nicholson to contact Wells Fargo if he
21 felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed
22 an arbitrary 60-day deadline in which Plaintiff Nicholson (and putative Class members) had to raise a
23 dispute with Wells Fargo regarding the product enrollment.

24                                  **Plaintiff Trevor Zander**

25      239.    During December 2023, Plaintiff Zander received a letter from Wells Fargo dated
26 November 28, 2023, stating that he had been "enrolled" in the "Credit Defense" product for the period
27 April 10, 2009 through December 31, 2009.

28

240.    Plaintiff Zander was shocked to receive the November 28, 2023, communication from Wells Fargo because he had not been a Wells Fargo customer for many years and never consented to receive the Credit Defense product referenced in the letter.

241.    Plaintiff Zander never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Credit Defense product until Wells Fargo had notified him about it in the letter.

242.    Several weeks later, Plaintiff Zander called the number listed on the November 28, 2023 letter from Wells Fargo (*i.e.*, 1-877-642-7826). The representative who answered the call informed Plaintiff Zander that he received the November 28, 2023 letter because he was enrolled in the Credit Defense product, and asked Plaintiff Zander if he authorized the product enrollment. Plaintiff Zander informed the representative that he had not authorized the enrollment. The representative informed Plaintiff Zander that he was entitled to a check from Wells Fargo in the amount of approximately $150. Plaintiff Zander later received a check he was issued for $150.78, which he did not cash.

243.    To date, Plaintiff Zander is still unaware of the amount he was charged for the Credit Defense product, why he was enrolled in the Credit Defense product, and whether Wells Fargo had enrolled him in other products or opened other accounts without his knowledge or consent.

244.    Plaintiff Zander searched through his emails and he could not find any information related to the Credit Defense product. He does not recall ever speaking with anyone from Wells Fargo or a third party regarding the product. He is certain he never intentionally enrolled in the product or ever made a claim for this product.

245.    Plaintiff Zander's account with Wells Fargo was closed sometime between 2010-2012 and he no longer has access to those bank records.

246.    Plaintiff Zander does not recall ever identifying any charge related to his Unauthorized Product on any previous statements. Had Plaintiff Zander noticed a suspicious charge on his account statement, he would have disputed the charge.

247.    Wells Fargo unilaterally discontinued Plaintiff Zander's enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knows Plaintiff Zander never authorized his enrollment in the product.

248.    Wells Fargo unfairly placed the onus on Plaintiff Zander to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Zander (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff Carey Runzel-Oberly**

249.    In late December 2023 and early February 2024, Plaintiff Runzel-Oberly received multiple letters from Wells Fargo indicating that she had been "enrolled" in an "Identity Theft Protection – Affinion" product for the period November 27, 2010 through December 17, 2010, another "Identity Theft Protection – Affinion" product without identifying the period, and a "Health Protector Bonus" product for the period May 12, 2011 through May 23, 2011.

250.    Plaintiff Runzel-Oberly never approved of, never wanted, and never knew about her enrollment by Wells Fargo in any of the products that Wells Fargo had notified her about. In fact, at the time Wells Fargo began charging her for the Health Protector Bonus product, Plaintiff Runzel-Oberly was already getting health insurance through her husband's employer and she had no need for any another health insurance. She also did not have any interest in any identity theft protection product.

251.    During the 2010 and 2011 time periods that Wells Fargo had enrolled her in both products, Plaintiff Runzel-Oberly is certain she would not have requested them because she could not afford to spend the extra money at that time to pay for them. Nor would Plaintiff Runzel-Oberly have voluntarily signed up for any free trial period. It was then, and still is, her policy not to sign up for free trial periods for any products. She was afraid of forgetting to cancel any product before the free trial period ended and always has been very wary of them. Had she known she was enrolled in or being charged for any products like this, she would have called Wells Fargo to put a stop to it immediately, as her practice had always been to call the vendor if she noticed an unusual or unauthorized charge to any of her accounts or credit cards.

252.    Upon receiving the notification letters, Plaintiff Runzel-Oberly looked through her own records to try to determine if she had ever been notified of her enrollment in the "Health Protector Bonus" or "Identity Theft Protection" services. She was unable to find any such notification. Plaintiff

1  Runzel-Oberly even contacted Wells Fargo to request copies of her old banking statements from the
2  relevant time period, but was told by Wells Fargo that it no longer had them.

3      253.    After receiving each of these letters, Plaintiff Runzel-Oberly called the phone number
4  Wells Fargo provided in the letter and spoke to Wells Fargo's representatives apparently on a recorded
5  line. The Wells Fargo representative who answered the call each time asked if Plaintiff Runzel-Oberly
6  remembered having enrolled in the product at issue. Each time Plaintiff Runzel-Oberly called and was
7  asked this question, she stated she had not authorized such enrollment. Each time, the representative
8  told her how much money she would be receiving from Wells Fargo.

9      254.    Plaintiff Runzel-Oberly learned from on-line research that, if she disputed the amount
10 initially told to her, Wells Fargo would offer to pay her $250, plus the amount initially offered.
11 Accordingly, in subsequent calls, Plaintiff Runzel-Oberly disputed the initial offered amounts. The
12 Wells Fargo representatives then also offered that Plaintiff Runzel-Oberly could engage in "mediation"
13 if she so chose.

14     255.    In connection with each product, Plaintiff Runzel-Oberly later received letters from
15 Wells Fargo offering "mediation." In each case, Plaintiff Runzel-Oberly was required to send forms
16 back to Wells Fargo requesting mediation, a process she found to be difficult and confusing. While
17 Plaintiff Runzel-Oberly initially did request mediation, she has since disavowed those requests.

18     256.    Plaintiff Runzel-Oberly believes the amounts of money she was offered by Wells Fargo
19 for each of the products at issue is inadequate to redress her injuries.

20     257.    Plaintiff Runzel-Oberly regularly reviews her monthly statements and does not recall a
21 charge related to her Unauthorized Product on any previous statements. Had Plaintiff Runzel-Oberly
22 noticed a suspicious charge on her account statement, she would have disputed the charge.

23     258.    Wells Fargo unilaterally discontinued Plaintiff Runzel-Oberly's enrollment in the
24 products without notifying her first or obtaining her authorization to terminate her enrollments. This
25 indicates that Wells Fargo knows Plaintiff Runzel-Oberly never authorized her enrollment in the
26 products.

27     259.    Wells Fargo unfairly placed the onus on Plaintiff Runzel-Oberly to contact Wells Fargo
28 if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also

1    imposed an arbitrary 60-day deadline in which Plaintiff Runzel-Oberly (and putative Class members)

2    had to raise a dispute with Wells Fargo regarding the product enrollment.

3                                              **Plaintiff Sara White**

4           260.    Over two decades ago, Plaintiff White had a checking and savings account with Wells

5    Fargo that she closed, prior to 2006, due to her dissatisfaction with Wells Fargo's banking practices.

6           261.    In February of 2023, Plaintiff White received two letters from Wells Fargo, both dated

7    February 14, 2023.

8           262.    One notified her that she had been "enrolled" in an "Income Protector Plus" product

9    from October 12, 2006 through March 11, 2007. The other notified her that she had been "enrolled" in

10   a "Sign/Drive Bonus" product from February 19, 2007 through July 6, 2007.

11          263.    Plaintiff White never approved of, never wanted, and never knew about her enrollment

12   by Wells Fargo in the Income Protector Plus product or the "Sign/Drive Bonus" product.

13          264.    Following her receipt of each letter from Wells Fargo, Plaintiff White called the

14   telephone number provided on the letter and spoke with a representative. However, the representative

15   was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment

16   of Plaintiff White into these products.

17          265.    Frustrated with the lack of information from Wells Fargo, and the third-party

18   representatives acting on behalf of Wells Fargo, Plaintiff White conducted an investigation of her own

19   records to search for anything related to the Income Protector Plus and/or Sign/Drive Bonus products

20   in which she was enrolled.

21          266.    Plaintiff White was unable to access her old account statements but she did perform a

22   search of her email account, which she has had since 2002, for anything related to "Wells Fargo,"

23   "Income Protector Plus" and/or "Sign/Drive Bonus," which revealed nothing.

24          267.    Plaintiff White is certain that she would not have signed up for the Income Protector

25   Plus or Sign/Drive Bonus products, because during the alleged enrollment period, Plaintiff White

26   worked several part-time jobs just to make ends meet. She did not have extra money to spend on add-

27   on products or services.

28

268.    Furthermore, Plaintiff White was very diligent at reviewing her monthly account statements and would have noticed a recurring charge for a product she did not recognize, such as Income Protector Plus or Sign/Drive Bonus. If she had noticed such a charge, she would have contacted Wells Fargo immediately to dispute the charge.

269.    Plaintiff White's diligence in reviewing periodic account statements is reflected in the multiple occasions, prior to closing her accounts with Wells Fargo, in which she contacted Wells Fargo regarding erroneous or unauthorized charges. On one occasion, Plaintiff White even contacted Wells Fargo to notify it of an accidental $1,000.00 deposit it had made into her account.

270.    Wells Fargo unilaterally discontinued Plaintiff White's enrollment in the products without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knows Plaintiff White never authorized these enrollments.

271.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff. White to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff White (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollments.

**Plaintiff Matthew Brady**

272.    Plaintiff Brady has never had a checking or savings account with Wells Fargo, but he obtained a mortgage loan with Wells Fargo in December of 2011.

273.    Plaintiff Brady was sent a letter by Wells Fargo, dated November 18, 2023, notifying him that he had been "enrolled" in an "Identity Theft Protection – Affinion" product from June 8, 2012 through September 27, 2012.

274.    Plaintiff Brady never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Identity Theft Protection – Affinion product.

275.    Following his receipt of the letter from Wells Fargo, Plaintiff Brady called the telephone number provided on the letter and spoke with a representative. However, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Brady into this product.

276.     Frustrated with the lack of information from Wells Fargo, and the third-party representatives acting on behalf of Wells Fargo, Plaintiff Brady conducted an investigation of his own records to search for anything related to the Identity Theft Protection product in which he was enrolled without his authorization.

277.     Plaintiff Brady was able to retrieve his original mortgage loan documentation with Wells Fargo which included projected escrow payments, loan terms, affiliated business arrangement disclosures, and insurance requirements. Plaintiff Brady searched these records for anything related to "Affinion" or "Identity Theft Protection," but the search revealed nothing.

278.     Plaintiff Brady also attempted to view his other banking account statements for the enrollment period, as that was the account used to pay his previous mortgage payments. However, he was unable to access statements prior to 2016.

279.     Plaintiff Brady regularly reviews his monthly statements and does not recall a charge related to his Unauthorized Product on any previous statements. Had Plaintiff Brady noticed a suspicious charge on his account statement, he would have disputed the charge.

280.     Plaintiff Brady knows with absolute certainty that he would not have signed up for Identity Theft Protection, with Wells Fargo or any company, as he did not have extra money to spend on add-on products or services at that time. Furthermore, Plaintiff Brady was in the Army at the time and away from home for the majority of the alleged enrollment period.

281.     Wells Fargo unilaterally discontinued Plaintiff Brady's enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knows Plaintiff Brady never authorized this enrollment.

282.     Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Brady to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Brady (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

### **Plaintiff Matthew Boyle**

283.     Plaintiff Boyle opened a checking account with Wells Fargo in the mid-2000's which was closed by 2010.

284.    On December 9, 2013, Plaintiff Boyle applied and was approved for an unsecured line of credit with Wells Fargo which he currently maintains.

285.    In February 2024, Plaintiff Boyle received a letter from Wells Fargo notifying him that he had been "enrolled" in an "Accidental Death" product from February 14, 2012 through March 31, 2018.

286.    Plaintiff Boyle never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Accidental Death product.

287.    Following his receipt of the letter from Wells Fargo, Plaintiff Boyle called the telephone number provided on the letter and spoke with a representative. However, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Boyle into this product.

288.    During the call, the representative informed Plaintiff Boyle that he could receive monetary compensation for his "enrollment" in the product if he takes part in mediation with Wells Fargo. Plaintiff Boyle has completed the mediation form and is currently awaiting a mediation date from Wells Fargo.

289.    Plaintiff Boyle conducted an investigation of his own records to search for anything related to the Accidental Death product that he was "enrolled" in, but he discovered nothing.

290.    Plaintiff Boyle is certain that he would not have signed up for an Accidental Death product, with Wells Fargo or any company, as he routinely rejects add-on products or services of any kind. Furthermore, Plaintiff Boyle regularly reviews his monthly account statements and does not recall a charge related to Accidental Death on any previous statements.

291.    Had Plaintiff Boyle noticed a suspicious charge on his account statement, he would have disputed the charge.

292.    Wells Fargo knew Plaintiff Boyle never authorized the "enrollment." That is why Wells Fargo unilaterally discontinued his enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment.

293.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Boyle to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo

1    also imposed an arbitrary 60-day deadline in which Plaintiff Boyle (and putative Class members) had
2    to raise a dispute with Wells Fargo regarding the product enrollment.

3    **Plaintiff Joseph Mitchell**

4    294.    Plaintiff Mitchell is a current Wells Fargo customer and has been since around 2004.

5    295.    Wells Fargo sent a letter dated November 16, 2023, to Plaintiff Mitchell, indicating that
6    he had been "enrolled" in the "Identity Theft Protection – Affinion" product for the period of August
7    17, 2010 through February 3, 2013.

8    296.    Wells Fargo sent a letter dated February 26, 2024, to Plaintiff Mitchell, indicating that
9    he had been "enrolled" in a "Hospital Accident" product for the period of September 16, 2011 through
10   August 31, 2018.

11   297.    Wells Fargo sent a letter dated July 23, 2024, to Plaintiff Mitchell, indicating that he
12   had been "enrolled" in a "Term Life" product for the period of October 4, 2012 through July 31, 2018.

13   298.    Plaintiff Mitchell never approved of, never wanted, and never knew about his
14   enrollment by Wells Fargo in the Identity Theft – Affinion, Hospital Accident, or Term Life products.

15   299.    After receiving the letters, Plaintiff Mitchell contacted Wells Fargo and was offered a
16   small sum of money in response to his involuntary enrollment in the products.

17   300.    The representative informed Plaintiff Mitchell that he could receive monetary
18   compensation for his enrollment in the products if he took part in mediation with Wells Fargo.
19   Dissatisfied with the amount offered for the unauthorized enrollment, Plaintiff Mitchell completed the
20   mediation request form offered by Wells Fargo.

21   301.    Plaintiff Mitchell completed the mediation form, attended mediation for the Identity
22   Theft Protection – Affinion and Hospital Accident products, and received additional compensation for
23   his participation and involuntary enrollment in the products. The mediation for the Term Life product
24   is scheduled for late January 2025.

25   302.    Plaintiff Mitchell regularly reviews his monthly statements and does not recall a charge
26   related to his Unauthorized Products on any previous statements. Had Plaintiff Mitchell noticed a
27   suspicious charge on his account statement, he would have disputed the charge.

28

303.    Plaintiff Mitchell has reviewed his account statements for the last seven years and there is no mention of these products in the account statements. He does not recall ever seeing any mention of these products in older account statements to which he no longer has access.

304.    Plaintiff Mitchell is certain that he would not have signed up for any of the products. Plaintiff Mitchell, a 100% disabled veteran, was offered both health and life insurance for his 24 years of service in the Army and would not have sought out insurance elsewhere. Plaintiff Mitchell was honorably discharged from the Army in 2004.

305.    Wells Fargo unilaterally discontinued Plaintiff Mitchell's enrollment in the products without notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells Fargo knows Plaintiff Mitchell never authorized his enrollment in the products.

306.    Wells Fargo unfairly placed the onus on Plaintiff Mitchell to contact Wells Fargo if he felt "that our actions do not address your situation."

**Plaintiff Jane Cothern**

307.    Plaintiff Cothern was a Wells Fargo customer beginning in 1973 and had a checking account for approximately 49 years before closing the account nearly one year ago.

308.    In February of 2024, Plaintiff Cothern received three letters from Wells Fargo, dated January 30, 2024, indicating that she had been "enrolled" in a "Disaster Mortgage" product.

309.    The first letter indicated that she had been enrolled in a "Disaster Mortgage" product for the period of September 17, 2013 through March 31, 2017.

310.    The second letter indicated that she had been enrolled in a "Disaster Mortgage" product for the period of March 1, 2007 through June 30, 2011.

311.    The third letter indicated that she had been enrolled in a "Disaster Mortgage" product for the period of January 16, 2007 through December 1, 2013.

312.    Plaintiff Cothern never approved of, never wanted, and never knew about her enrollments by Wells Fargo in the Disaster Mortgage product.

313.    In July of 2024, Plaintiff Cothern received three additional letters from Wells Fargo, dated July 25, 2024, notifying her that she had been "enrolled" in an "Optional" product on her mortgage product from November 1, 2010 through July 1, 2013 and also November 1, 2013 through

March 1, 2017, and that she has been "enrolled" in an "Accidental Death" product for the period of April 26, 2011 through September 14, 2018.

314.  Plaintiff Cothern never approved of, never wanted, and never knew about her enrollments by Wells Fargo in the Optional product or the Accidental Death product.

315.  Following her receipt of the letters from Wells Fargo, Plaintiff Cothern called the telephone number provided on the letter and spoke with a representative. However, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Cothern into these products.

316.  Plaintiff Cothern conducted an investigation of her own records to search for anything related to the Disaster Mortgage, Optional, or Accidental Death products that in which she was enrolled, but she was unable to access account statements for the alleged enrollment periods.

317.  Plaintiff Cothern also searched her email account for anything related to her enrollment in the Unauthorized Products and found nothing.

318.  Plaintiff Cothern is certain that she would not have signed up for the Disaster Mortgage, Optional, or Accidental Death products because during the alleged enrollment periods, Plaintiff Cothern was a single mother who raised two children on her own and worked two jobs just to pay the bills and keep food on the table. She did not have extra money to spend on add-on products or services.

319.  Furthermore, Plaintiff Cothern regularly checked her monthly account statements but never saw anything that seemed out of place and she certainly did not see anything related to the various add-on products in which she was enrolled. Had she observed anything of the sort, she would have immediately contacted Wells Fargo to dispute the charges. In fact, Plaintiff Cothern had contacted Wells Fargo numerous times in the past to dispute other account errors which is ultimately the reason she canceled her account.

320.  Wells Fargo unilaterally discontinued Plaintiff Cothern's enrollment in the products without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knew Plaintiff Cothern never authorized these enrollments.

321.  Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Cothern to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo

1    also imposed an arbitrary 60-day deadline in which Plaintiff Cothern (and putative Class members) had

2    to raise a dispute with Wells Fargo regarding the product enrollments.

3                                      **Plaintiff Clenten Sims**

4            322.    On or about February 5, 2024, Plaintiff Sims received a letter from Wells Fargo

5    indicating that he had been "enrolled" in an "Accidental Disability" product for the period of January

6    13, 2010 through February 4, 2010.

7            323.    Plaintiff Sims never approved of, never wanted, and never knew about his enrollment

8    by Wells Fargo in the Accidental Disability product.

9            324.    During the early 2010 time-period at issue, Plaintiff Sims had a habit—and still does—

10   of reviewing his bank and credit card statements, which he always receives in the mail, to make certain

11   he is not being charged for something he did not purchase. Had he seen any charges for this product or,

12   for that matter, charges for any other unwanted product, Plaintiff Sims immediately would have called

13   Wells Fargo to question it, remove the product and demand that his account be reimbursed.

14           325.    Plaintiff Sims has no recollection of receiving any marketing materials from Wells

15   Fargo for the product at issue, nor did he want or have any interest in disability insurance during the

16   enrollment period. At that time, Plaintiff Sims would have been in his early 30's, and disability

17   insurance was not even on his radar.

18           326.    Wells Fargo unilaterally discontinued Plaintiff Sims' enrollment in the product without

19   notifying him first or obtaining his authorization to terminate his enrollment. This indicates that Wells

20   Fargo knows Plaintiff Sims never authorized his enrollment in the product.

21           327.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Sims to contact Wells

22   Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo

23   also imposed an arbitrary 60-day deadline in which Plaintiff Sims (and putative Class members) had to

24   raise a dispute with Wells Fargo regarding the product enrollment.

25                                      **Plaintiff Ezdehar Husein**

26           328.    Plaintiff Husein opened a checking account with Wells Fargo right out of college in

27   2005. She had the account for several years before closing it in approximately 2010.

28

329.    Wells Fargo sent a letter dated June 17, 2024, to Plaintiff Husein, indicating that she had been "enrolled" in an "INS Single Individual Life" product for the period of January 10, 2007 through May 8, 2007.

330.    Plaintiff Husein never approved of, never wanted, and never knew about her enrollment by Wells Fargo in the INS Single Individual Life product. In fact, Plaintiff Husein has never even heard of the product and cannot ascertain what it might entail.

331.    Plaintiff Husein attempted to conduct an investigation of her records to search for anything related to the INS Single Individual Life product in which she was enrolled without authorization. She tried to access old account statements via online, email, and phone by contacting a Wells Fargo representative. Unfortunately, Plaintiff Husein was unable to access her old email account as she no longer had the password nor the phone number to send a security code to retrieve the password. Online, Plaintiff Husein could only access account statements from 2017 to 2024, and when she requested prior account statements via phone from a Wells Fargo representative, she was advised that Wells Fargo is not legally obligated to retain records beyond seven years and they were no longer accessible.

332.    Plaintiff Husein is certain that she would not have signed up for INS Single Individual Life. First and foremost, she does not even know what the product is. Second, even if she were to assume the product was insurance related, Plaintiff Husein was offered both health and life insurance through her employer at the time, Boeing, and would not have sought out insurance elsewhere.

333.    Plaintiff Husein is very meticulous and regularly scoured her account statements each month. Had she noticed a recurring charge for a product she did not recognize, such as INS Single Individual Life, she would have immediately contacted Wells Fargo to dispute the charge.

334.    Wells Fargo unilaterally discontinued her enrollment in the product without notifying her first or obtaining her authorization to terminate her enrollment. This indicates that Wells Fargo knows Plaintiff Husein never authorized this enrollment.

335.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Husein to contact Wells Fargo if she felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo

1    also imposed an arbitrary 60-day deadline in which Plaintiff Husein (and putative Class members) had

2    to raise a dispute with Wells Fargo regarding the product enrollment.

3                                              **Plaintiff Vikalp Agrawal**

4            336.    Plaintiff Agrawal traveled on a work visa to the United States from India in February

5    2007. Upon his arrival, he opened a checking account with Wells Fargo to enable him to receive

6    automatic deposit of his paychecks.

7            337.    Plaintiff Agrawal was the sole user of the Wells Fargo checking account and debit card

8    (which was never lost or misplaced). Additionally, as he was new to the country, Plaintiff Agrawal did

9    not engage in online transactions. Because of this, Plaintiff Agrawal believed that the overall

10   probability of having any unauthorized transactions associated with his account was very low, unless it

11   was facilitated by the bank itself.

12           338.    Plaintiff Agrawal reasonably reviewed his monthly statements and does not recall a

13   charge related to his Unauthorized Product on any previous statements. Had Plaintiff Agrawal noticed

14   a suspicious charge on his account statement, he would have disputed the charge.

15           339.    On June 14, 2024, Wells Fargo sent a letter to Plaintiff Agrawal informing him that

16   Wells Fargo's records indicated that he had been "enrolled" in a "Preferred" product from May 3, 2007

17   through May 21, 2007.

18           340.    Plaintiff Agrawal never approved of, never wanted, and never knew about his

19   enrollment by Wells Fargo in the Preferred product.

20           341.    On July 8, 2024, Wells Fargo sent a letter to Plaintiff Agrawal informing him that Wells

21   Fargo's records indicated that he had been "enrolled" in a "Purchase Shield (English and Spanish)"

22   product from August 19, 2009 through August 31, 2009.

23           342.    Plaintiff Agrawal never approved of, never wanted, and never knew about his

24   enrollment by Wells Fargo in the Purchase Shield product.

25           343.    Plaintiff Agrawal received yet another letter from Wells Fargo notifying him that Wells

26   Fargo's records indicated that he had been "enrolled" in a "Sign/Drive Bonus" product from May 4,

27   2009 through May 14, 2009 and August 13, 2009 through September 28, 2009.

28

344.    Plaintiff Agrawal never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Sign/Drive Bonus product.

345.    Plaintiff Agrawal received a fifth letter from Wells Fargo notifying him that Wells Fargo's records indicated that he had been "enrolled" in a "Health Protector Bonus" product from March 7, 2009 through March 30, 2009.

346.    Plaintiff Agrawal never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Health Protector Bonus product.

347.    Following the receipt of each letter, Plaintiff Agrawal called the telephone number provided on the letter and spoke with a representative. During each call, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Agrawal into these products.

348.    Plaintiff Agrawal attempted to conduct an investigation of his own records to search for anything related to the Preferred, Purchase Shield, Sign/Drive Bonus, and/or Health Protector Bonus products that he was enrolled in, but he was unable to access his checking account statements from the alleged enrollment periods.

349.    Plaintiff Agrawal also searched his email account for anything related to Wells Fargo, Preferred, Purchase Shield, Sign/Drive Bonus, and/or Health Protector Bonus, but he did not discover anything.

350.    Plaintiff Agrawal knows with absolute certainty that he would not have signed up for the Preferred, Purchase Shield, Sign/Drive Bonus, and/or Health Protector Bonus products with Wells Fargo or any company, as he was in the United States on a work visa and did not intend to remain in the country at the time. Additionally, with respect to the Sign/Drive Bonus product, Plaintiff Agrawal did not own a vehicle at that time, nor did he have a driver's license to operate a vehicle in the United States so it would not have made sense for him to sign up for a product related to driving. Furthermore, he does not even know what the products are and neither product name provides a sufficient description to make an educated guess as to what the products entail.

351.    Lastly, each of the Wells Fargo letters reveal that Plaintiff Agrawal was not enrolled in any product for longer than a period of thirty (30) days so it is not likely that a fee for any product would be noticeable on his account statements even if it were in fact present.

352.    Wells Fargo knew Plaintiff Agrawal never authorized these "enrollments." Wells Fargo unilaterally discontinued Plaintiff Agrawal's enrollment in the products without notifying him first or obtaining his authorization to terminate his enrollment.

353.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Agrawal to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Agrawal (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff John Schultz**

354.    Plaintiff Schultz had a mortgage loan with Wells Fargo from 2003 to 2017 and also had an unsecured line of credit with Wells Fargo between 2006-2013.

355.    On August 26, 2024, Wells Fargo sent a letter to Plaintiff Schultz informing him that Wells Fargo's records indicated that he had been "enrolled" in a "FDR Multiple Products" product from November 7, 2008 through May 19, 2009.

356.    Plaintiff Schultz never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the "FDR Multiple Products" product.

357.    Following his receipt of the letter from Wells Fargo, which contained a small amount of compensation, Plaintiff Schultz called the telephone number provided on the letter and spoke with a representative. However, the representative was unable to disclose details concerning the circumstances of Wells Fargo's unauthorized enrollment of Plaintiff Schultz into this product.

358.    During the call, the representative offered to provide Plaintiff Schultz with a Mediation Request Form, which he agreed to receive.

359.    Plaintiff Schultz conducted an investigation of his own records to search for anything related to the "FDR Multiple Products" product that he was enrolled in, but he discovered nothing.

360.    Plaintiff Schultz is certain that he would not have signed up for the "FDR Multiple Products" product. First and foremost, he does not even know what the product is and the product

name does not provide a sufficient description to make an educated guess as to what the product entails. Second, even if he were to assume the product was insurance related, Plaintiff Schultz was offered both health and life insurance through his Union during his 27-year career as a laborer. It would not have made sense for him to seek out insurance elsewhere.

361.    Plaintiff Schultz regularly reviews his monthly mortgage statements and does not recall a charge related to "FDR Multiple Products" on any previous statements. Had Plaintiff Schultz noticed a suspicious charge on his account statement, he would have disputed the charge.

362.    Wells Fargo knew Plaintiff Schultz never authorized these "enrollments." That is why Wells Fargo unilaterally discontinued his enrollment in the product without notifying him first or obtaining his authorization to terminate his enrollment.

363.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Schultz to contact Wells Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo also imposed an arbitrary 60-day deadline in which Plaintiff Schultz (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

**Plaintiff Sean Rose**

364.    At no time in his life has Plaintiff Rose knowingly and with consent maintained a financial account with Wells Fargo including, but not limited to, not having any checking accounts, savings accounts, credit cards, unsecured lines of credit, automobile loans, secured lines of credit, mortgage loans, home equity lines of credit and/or retirement accounts with Wells Fargo.

365.    On February 2, 2024, Wells Fargo sent Plaintiff Rose a letter informing him that Wells Fargo's records indicated he had been "enrolled" in a "Health Protector Bonus" product from July 11, 2008 to December 1, 2008.

366.    Plaintiff Rose never approved of, never wanted, and never knew about his enrollment by Wells Fargo in the Health Protector Bonus product.

367.    Following his receipt of the February 2, 2024 letter from Wells Fargo, on February 12, 2024 and February 14, 2024 Plaintiff Rose called the customer service number on the letter and spoke with multiple representatives, including people named "Chaud" and "Victoria," one of whom was

1  identified as a supervisor, who confirmed that Plaintiff Rose had been enrolled in the Health Protector
2  Bonus product.

3      368.    Following the February 14, 2024 call, Wells Fargo sent two payments to Plaintiff Rose
4  totaling $404.52 and $250.00 without any further explanation being provided to Plaintiff Rose about
5  how Wells Fargo had obtained his information to sign him up for the Health Protector Bonus product.

6      369.    Plaintiff Rose conducted an investigation of his own records to search for anything
7  related to a Health Protector Bonus product, but he discovered nothing.

8      370.    Plaintiff Rose is certain that he never signed up for the Health Protector Bonus product.
9  First and foremost, he does not even know what the product is and the product name does not provide a
10  sufficient description to make an educated guess as to what the product entails. Second, he was not a
11  Wells Fargo customer as of July 11, 2008, and he was unaware of any time prior to July 11, 2008 when
12  he provided Wells Fargo with his personally identifiable information. Third, even if he somehow gave
13  his personally identifiable information to Wells Fargo and knew what this product was, at the time of
14  his enrollment in the Unauthorized Product, Plaintiff Rose was 21 years old and a struggling actor with
15  health care benefits provided through the Screen Actors Guild. Plaintiff Rose could not afford to pay
16  for this product at that time, and it would not have made financial sense for him to seek out health
17  "protection" elsewhere.

18      371.    Plaintiff Rose regularly reviews his financial account statements, and he does not recall
19  seeing a charge for a Health Protector Bonus product on any of his financial statements at the time.
20  Had Plaintiff Rose noticed a suspicious charge on any of his accounts, or discovered that Wells Fargo
21  had opened an account in his name, he would have immediately taken action to dispute the amounts
22  owed and to protect his identity.

23      372.    Wells Fargo knew Plaintiff Rose never authorized this "enrollment." That is why Wells
24  Fargo unilaterally discontinued his enrollment in the product without notifying him first or obtaining
25  his authorization to terminate his enrollment.

26      373.    Furthermore, Wells Fargo unfairly placed the onus on Plaintiff Rose to contact Wells
27  Fargo if he felt "that the enrollment in this product was not authorized or not wanted." Wells Fargo

28

also imposed an arbitrary 60-day deadline in which Plaintiff Rose (and putative Class members) had to raise a dispute with Wells Fargo regarding the product enrollment.

## CLASS ALLEGATIONS

374.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

375.    Plaintiffs are members of and seek to represent a Nationwide Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All persons in the United States to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service other than an Unauthorized Account covered by the settlement in *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal.).

376.    Plaintiffs Cothern, Martinez, Rocha, Rose, Runzel-Oberly, and Sims are members of and seek to represent a California Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of California to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service other than an Unauthorized Account covered by the settlement in *Jabbari v. Wells Fargo & Co.*, No. 3:15-cv-02159-VC (N.D. Cal.).

377.    Plaintiff Gonzales is a member of and seeks to represent a New Mexico Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of New Mexico to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

378.    Plaintiffs Huber and Zander are members of and seek to represent a Minnesota Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of Minnesota to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

379.    Plaintiffs C. Barker and N. Barker are members of and seek to represent a Nevada Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of Nevada to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

380.    Plaintiffs Mitchell and Thomas are members of and seek to represent a Georgia Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of Georgia to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

381.    Plaintiff Brady is a member of and seeks to represent an Arkansas Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of Arkansas to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

382.    Plaintiff Boyle is a member of and seeks to represent a New Jersey Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of New Jersey to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

383.    Plaintiffs Higgs and Agrawal are members of and seek to represent a North Carolina Class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) and/or (c)(4) defined as follows:

> All residents of North Carolina to whom Wells Fargo sent at least one letter stating that they were enrolled in any product or service.

384.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

385.    Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Class definitions to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues.

386.    Plaintiffs reserve the right under Federal Rule of Civil Procedure 23(c)(4) to seek certification of particular issues.

387.    The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

388.    The Federal Rule of Civil Procedure 23(a) elements of numerosity, commonality, typicality, and adequacy are all satisfied.

389.    **Numerosity**: The exact number of Class members is not available to Plaintiffs, but it is clear that individual joinder is impracticable. Millions of consumers use Wells Fargo for various financial services. Members of the Classes can be identified through Defendants' records or by other means.

390.    **Commonality**: Commonality requires that the Class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Class members as to whether Wells Fargo purchased or subscribed to products without authorization or lawful authority. Common questions and/or issues for Class members include, but are not necessarily limited to the following:

- Whether Plaintiffs and the Class members were enrolled in one or more products without their authorization;

- Whether Wells Fargo created any new accounts on behalf of Plaintiffs and the Class members in connection with the products that they were enrolled in without their authorization or knowledge;

- Whether Wells Fargo transferred any funds through and between new and/or existing accounts of Plaintiffs and the Class members to pay for one or more products that they were enrolled in without their authorization or knowledge;

- Whether Wells Fargo improperly diverted, or converted, for its own benefit, the funds of Plaintiffs and the Class members to pay for one or more products that they were enrolled in without their authorization or knowledge;

- Whether Wells Fargo's conduct was "unfair" or "deceptive" as those terms are defined by state and federal statutes;

- Whether Wells Fargo's conduct was otherwise unlawful;

- Whether Wells Fargo was unjustly enriched by the complained of conduct herein;

- Whether Plaintiffs and the Classes were damaged by Wells Fargo;

- Whether Plaintiffs and the Classes are entitled to declaratory relief;

- Whether Plaintiffs and the Classes are entitled to injunctive or other equitable relief; and

- Whether Plaintiffs and the Classes are entitled to damages, declaratory, injunctive or equitable relief.

391.    **Typicality**: Plaintiffs' claims are typical of the claims of other Class members in that Plaintiffs and the Class members sustained injuries arising out of Defendants' uniform wrongful conduct.

392.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' claims are made in a representative capacity on behalf of the Class members. Plaintiffs have no interests antagonistic to the interests of the other Class members. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the Classes. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class members.

393.    **This case also satisfies Federal Rule of Civil Procedure 23(b)(2) – Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect the Class members uniformly, and Plaintiffs' challenge to those practices hinge on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

394.    The declaratory and injunctive relief sought in this case includes, but is not limited to:

- Entering a declaratory judgment against Defendants regarding the aggregate liability to the Class, that Defendants' conduct was unlawful, and that Defendants failed to obtain lawful authorization to engage in the conduct at issue; and

- Entering an injunction against Defendants requiring Defendants to cease their unlawful conduct complained of in this lawsuit; identify all persons who were enrolled in the Unauthorized Products; provide a full accounting of all amounts that Class members were charged for the Unauthorized Products, and all commissions, fees or amounts earned by Wells Fargo for enrolling Class members in the Unauthorized Products; provide each member of the Class with restitution making them whole; disgorge all unjust profits to the Class; cease and desist from providing insufficient, opaque, and incomplete information to Class members; and reforming the Wells Fargo remediation program so that, in conjunction with the resolution of this litigation, it provides full make-whole relief to all Class members.

395.    **This case also satisfies Federal Rule of Civil Procedure 23(b)(3) – Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and Class members, and those questions predominate over any questions that may affect individual Class members.

396.    **This case also satisfies Federal Rule of Civil Procedure 23(b)(3) – Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual Class members to obtain effective relief from Defendants' misconduct. Even if Class members could mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

1
2
3

## COUNT I
### Violations of the Fair Credit Reporting Act
### 15 U.S.C. § 1681 *et seq.*
### On Behalf of Plaintiffs and the Nationwide Class

4      397.    Plaintiffs repeat and reallege paragraphs 1–396 as if fully set forth herein.

5      398.    Each time that Wells Fargo opens a new product or starts a new financial service, it

6 obtains, reviews, and uses a consumer report (as that term is defined in 15 U.S.C. § 1681a(d)) on

7 Plaintiffs and Class members.

8      399.    Plaintiffs and Class members did not authorize Wells Fargo to obtain or use their

9 consumer reports for such purposes. Wells Fargo obtained and used the consumer reports containing

10 credit reporting information without their consent for impermissible purposes in violation of 15 U.S.C.

11 § 1681b, and opened accounts or enrolled Plaintiffs and Class members in products without

12 authorization in violation of the law.

13      400.    This information about the Class members allowed Wells Fargo employees to identify

14 Unauthorized Products to enroll Class members in, and facilitated Wells Fargo employees in opening

15 accounts, if necessary, to effectuate enrollment. Wells Fargo also relied on third-party vendors to

16 enroll Class members into Unauthorized Products, collecting commissions from those vendors. Thus,

17 improper use of the credit reports is directly tethered to the harm of enrolling Class members in

18 Unauthorized Products, and the fees and charges associated with that enrollment.

19      401.    Wells Fargo obtained and used the consumer reports under false pretenses and without

20 proper authorization from Plaintiffs and Class members in violation of 15 U.S.C. § 1681n(a)(1)(B).

21      402.    Wells Fargo knowingly and intentionally engaged in the unlawful conduct that violates

22 the FCRA, and is liable under 15 U.S.C. §§ 1681n and 1681o for negligent and willful violations of the

23 FCRA.

24
25
26
27
28

## COUNT II

### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et seq.*
### On Behalf of All Plaintiffs and the Nationwide Class, or in the Alternative, Plaintiffs Cothern, Martinez, Rocha, Runzel-Oberly, Sims, and the California Class

403.    Plaintiffs Cothern, Martinez, Rocha, Rose, Runzel-Oberly, and Sims repeat and reallege paragraphs 1–396 as if fully set forth herein.

404.    Plaintiffs Cothern, Martinez, Rocha, Rose, Runzel-Oberly, Sims, and the Class members suffered injury in fact and lost money or property as a result of Wells Fargo's conduct because they paid for Unauthorized Products.

405.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. UCL is interpreted broadly and provides a right of action for any unlawful or unfair business act or practice that causes injury to consumers.

406.    Wells Fargo engages in substantial sales and marketing activities in California.

407.    The actions and omissions that give rise to this litigation were conceived, designed, facilitated, instigated, overseen, managed, and coordinated by Defendants' leadership in California, and uniform conduct emanated from California harming all Plaintiffs and Class members (including citizens and non-citizens of the State of California) in the same way, such that California law applies to Plaintiffs' and Class members' claims. California has a substantial interest that its laws be applied to Wells Fargo's conduct alleged herein that substantially outweighs any interests of other states.

408.    ***Unlawful Prong:*** Wells Fargo's acts and practices, as described herein, constitute "unlawful" business acts or practices because they violate numerous statutes including the FCRA. Plaintiffs individually, and on behalf of Class members, reserve the right to allege other violations of law, which constitute unlawful business acts or practices. Such conduct is ongoing and continues to this date. The statutes Wells Fargo violated include:

•    FCRA (incorporating Count I above);

- Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*, by failing to properly disclose the intent share consumers' non-public personal information and failing to allow consumers to opt-out of such sharing;

- California Financial Information Privacy Act, Cal. Fin. Code § 4050 *et seq.*, by failing to properly disclose the intent share consumers' non-public personal information and failing to allow consumers to opt-out of such sharing;

- New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1 *et seq.*;

- Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.68 *et seq.*;

- Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. Ann. § 325D.43 *et seq.*;

- Nevada Trade Regulations and Practices Act, Nev. Rev. Stat. § 598.0903 *et seq.*;

- Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390 *et seq.*;

- North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*;

- Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*; and

- New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq.*

409.   ***Unfair Prong:*** Wells Fargo also commits "unfair" business acts or practices by, among other things, enrolling consumers in products or services without their knowledge and then charging the consumers for those products or services and engaging in a misleading and insufficient remediation process, as set forth more fully herein. There is no societal benefit from charging consumers for products and services they do not authorize or want—only harm. While Plaintiffs and Class members were harmed, Wells Fargo was unjustly enriched by its unfair business acts or practices. As a result, Wells Fargo's conduct is "unfair," as it offended an established public policy. Further, Wells Fargo engaged in immoral, unethical, oppressive, unconscionable, and unscrupulous activities that are substantially injurious to consumers. There were reasonably available alternatives to further Wells Fargo's legitimate business interests, other than enrolling consumers in products and services without their authorization and charging them for those Unauthorized Products.

410.   Unless restrained and enjoined, Wells Fargo will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate as well as disgorgement and restitution

of all revenues associated with this unfair and unlawful conduct, or such portion of said revenues as the Court may find applicable.

411.    Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, seek restitution from Wells Fargo of all money obtained from Plaintiffs and the Class members collected as a result of unfair competition, an injunction prohibiting Wells Fargo from continuing such practices, a full and accurate accounting of the amounts charges for the Unauthorized Products and the dates of enrollment, and all other relief this Court deems appropriate, consistent with California Business and Professions Code § 17203.

412.    In the alternative to those claims seeking remedies at law, Plaintiff and class members allege that there is no plain, adequate, and complete remedy that exists at law to address Defendant's unlawful and unfair business practices. The legal remedies available to Plaintiffs are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief. In addition to legal remedies, Plaintiffs are entitled to and seek injunctive relief including accurate accountings of all charges and fees associated with the Unauthorized Products; a Court order prohibiting Wells Fargo from reinstituting enrollment or engaging in the same conduct in the future; and changes to the remediation program to prevent Wells Fargo from withholding material information related to the misconduct from Class members on request. Additionally, unlike damages, the Court's discretion in fashioning equitable relief is very broad and can be awarded in situations where the entitlement to damages may prove difficult. Thus, restitution would allow recovery even when normal considerations associated with damages would not. Furthermore, the standard, showing, and necessary elements for a violation of the UCL "unlawful" and "unfair" prongs are different from those that govern legal claims.

**COUNT III**
**Violations of the New Mexico Unfair Practices Act**
**N.M. Stat. Ann. § 57-12-1 *et seq*.**
**On Behalf of Plaintiff Gonzales and the New Mexico Class**

413.    Plaintiff Gonzales repeats and realleges paragraphs 1–396 as if fully set forth herein.

414.    The New Mexico Unfair Practices Act prohibits unconscionable trade practices, which are defined as acts or practices that, to a person's detriment, "take[] advantage of the lack of

1   knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) result[] in a

2   gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. §§ 57-12-

3   2(E), 57-12-3.

4        415.    Wells Fargo's acts and practices, as described herein, constitute unlawful  or

5   unconscionable acts or practices, in that (1) Wells Fargo's practices violate numerous statutes as

6   described herein; (2) the justification for Wells Fargo's practices is outweighed by the gravity of the

7   consequences to Plaintiff Gonzales and New Mexico Class members; (3) Wells Fargo's conduct is

8   immoral, unethical, oppressive, unconscionable, or substantially injurious to Plaintiff Gonzales and

9   New Mexico Class members; and/or (4) the uniform conduct of Wells Fargo has a tendency to deceive

10  Plaintiff Gonzales and New Mexico Class members.

11       416.    Wells Fargo's unlawful and unfair business acts and practices, as described above,

12  include, but are not limited to, wrongfully and without authorization enrolling Plaintiff Gonzales and

13  New Mexico Class members, Wells Fargo's customers, in products—using customers' money to pay

14  for fees, costs, and other penalties related to the Unauthorized Products—without Plaintiff Gonzales'

15  and New Mexico Class members' knowledge or authorization, and depriving them of any of the

16  supposed benefits of the products that they were unknowingly enrolled in without their authorization.

17       417.    Wells Fargo's unconscionable trade practices take advantage of the lack of knowledge,

18  ability, experience or capacity of Plaintiff Gonzales and New Mexico Class members to a grossly

19  unfair degree and to their detriment, as Wells Fargo surreptitiously enrolled them into products that

20  they did not want or authorize, and Wells Fargo surreptitiously took their money to pay for these

21  products.

22       418.    Plaintiff Gonzales and New Mexico Class members suffered actual damages as a result

23  of Wells Fargo's unlawful conduct.

24                                   **COUNT IV**

25            **Violations of the Minnesota Prevention of Consumer Fraud Act**
             **Minn. Stat. Ann. § 325F.68** *et seq.*
26            **On Behalf of Plaintiffs Huber and Zander and the Minnesota Class**

27       419.    Plaintiffs Huber and Zander repeat and reallege paragraphs 1–396 as if fully set forth

28  herein.

420.    The Minnesota Consumer Protection Act prohibits unfair or unconscionable trade practices, which are defined as acts or practices that: "(1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. Ann. § 325F.69.

421.    Wells Fargo's acts and practices, as described herein, constitute unlawful, unfair, or unconscionable acts or practices, in that (1) Wells Fargo's practices violate public policy, common law, and numerous state and federal statutes as described herein; (2) the justification for Wells Fargo's practices is outweighed by the gravity of the consequences to Plaintiffs Huber and Zander and Minnesota Class members; (3) Wells Fargo's conduct is immoral, unethical, oppressive, unscrupulous, unconscionable, or substantially injurious to Plaintiffs Huber and Zander and Minnesota Class members; and/or (4) the uniform conduct of Wells Fargo has a tendency to deceive Plaintiffs Huber and Zander and Minnesota Class members.

422.    Wells Fargo's unlawful and unfair business acts and practices, as described above, include, but are not limited to, wrongfully and without authorization enrolling Plaintiffs Huber and Zander and Minnesota Class members, Wells Fargo's customers, in products—using customers' money to pay for fees, costs, and other penalties related to the Unauthorized Products—without Plaintiffs Huber's and Zander's and Minnesota Class members' knowledge or authorization, and depriving them of any of the supposed benefits of the products that they were unknowingly enrolled in without their authorization.

423.    Wells Fargo's unconscionable trade practices take advantage of the lack of knowledge, ability, experience or capacity of Plaintiffs Huber and Zander and Minnesota Class members to a grossly unfair degree and to their detriment, as Wells Fargo surreptitiously enrolled them into products that they did not want or authorize and Wells Fargo surreptitiously took their money to pay for these products.

424.    Plaintiffs Huber and Zander and Minnesota Class members suffered actual damages as a result of Wells Fargo's unlawful conduct.

## COUNT V

**Violations of the Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. Ann. § 325D.43** *et seq.*
**On Behalf of Plaintiffs Huber and Zander and the Minnesota Class**

425.    Plaintiffs Huber and Zander repeat and reallege paragraphs 1–396 as if fully set forth herein.

426.    The Minnesota Uniform Deceptive Trade Practices Act ("MDTPA") prohibits deceptive trade practices, which occur when a person "engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices." Minn. Stat. Ann. § 325D.43. In the course of Wells Fargo's business, it engaged in unfair and unconscionable acts or practices by enrolling Plaintiffs Huber and Zander and Minnesota Class members in products and services they did not want and charging them for those Unauthorized Products. Wells Fargo also engaged in unfair and unconscionable acts or practices by sending deficient notification letters and creating an onerous and misleading remediation process.

427.    Plaintiffs Huber and Zander and Minnesota Class members suffered ascertainable loss and actual damages as a direct and proximate result of Wells Fargo's unfair and unconscionable conduct. Wells Fargo's violations present a continuing risk to Plaintiffs Huber and Zander, as well as the general public.

428.    Pursuant to Minn. Stat. Ann. § 325D.45, Plaintiffs Huber and Zander and Minnesota Class members seek injunctive relief, costs and attorneys' fees, and any other just and proper relief available under the MDTPA. *Id.* § 325D.45.

## COUNT VI

**Violation of the Nevada Trade Regulations and Practices Act**
**Nev. Rev. Stat. § 598.0903** *et seq.*
**On Behalf of the Barker Plaintiffs and Nevada Class**

429.    The Barker Plaintiffs repeat and reallege paragraphs 1–396 as if fully set forth herein.

430.    The Nevada Trade Regulations and Practices Act ("NTRPA") defines a "deceptive trade practice" as follows: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [f]ails to disclose a material fact in connection with the sale or lease of goods or services." Nev. Rev. Stat. § 598.0923(1)(b).

431.    A person also "engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly . . . [v]iolates a state or federal statute or regulation relating to the sale or lease of goods or services." *Id.* § 598.0923(1)(c).

432.    The NTRPA defines an "unconscionable practice" as "an act or practice which, to the detriment of a consumer . . . [t]akes advantage of the lack of knowledge . . . of the consumer to a grossly unfair degree." *Id.* § 598.0923(2)(b)(1).

433.    Wells Fargo's acts and practices, as described herein, constitute a deceptive trade practice and an unconscionable practice under the NTRPA, in that Wells Fargo has engaged in a practice which, to consumers' detriment, obtained and used the consumer reports for impermissible purposes in violation of 15 U.S.C. § 1681b.

434.    Wells Fargo obtained and used the Barker Plaintiffs' and Nevada Class members' consumer reports under false pretenses and without proper authorization from the Barker Plaintiffs and Nevada Class members in violation of the FCRA, 15 U.S.C. § 1681b.

435.    Wells Fargo's acts and practices, as described herein, constitute a deceptive trade practice and an unconscionable practice under the NTRPA, in that Wells Fargo enrolled the Barker Plaintiffs and Nevada Class members in products without authorization in violation of 15 U.S.C. § 45(a)(1).

436.    Due to Wells Fargo's violations of the NTRPA, Wells Fargo is liable to the Barker Plaintiffs and the Nevada Class members for actual damages in an amount to be determined at trial, and equitable relief, pursuant to Nev. Rev. Stat. § 41.600(2)(e).

## COUNT VII

### Violations of the Georgia Fair Business Practices Act
### Ga. Code Ann. § 10-1-390 *et seq.*
### On Behalf of Plaintiffs Thomas, Mitchell, and the Georgia Class

437.    Plaintiffs Thomas and Mitchell repeat and reallege paragraphs 1–396 as if fully set forth herein.

438.    The Georgia Fair Business Practices Act of 1975 ("GFBPA"), Ga. Code Ann. § 10-1-390 *et seq.*, was enacted to "protect consumers . . . from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state" of Georgia. *Id.* § 10-1-391(a).

439.    Ga. Code Ann. § 10-1-391 directs that the GFPBA is to be interpreted and applied liberally and in harmony with the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), which implements the Fair Debt Collection Practices Act. Ga. Code Ann. § 10-1-393(a) of the GFBPA broadly prohibits unfair or deceptive business practices.

440.    Wells Fargo intentionally engaged in unfair and deceptive business practices, as set forth above, in an effort to increase revenue and income by enrolling its customers, including Plaintiffs Thomas, Mitchell, and Georgia Class members, in various financial and insurance products and services and then charging them for those Unauthorized Products, without their knowledge and consent.

441.    Wells Fargo made implicit and express representations to its customers that they would only be charged for the products and services they authorized.

442.    Wells Fargo's misconduct has implications for the consuming public in general. Wells Fargo's conduct negatively impacts the consumer marketplace.

443.    More than thirty days prior to the filing of this complaint, Plaintiffs Thomas and Mitchell provided the written notice to Wells Fargo required under Ga. Code Ann. § 10-1-399(b) to notify Wells Fargo of Plaintiffs Thomas', Mitchell's, and the Georgia Class's claims for violations of the GFBPA.

444.    As a result of Wells Fargo's violations of Ga. Code Ann. § 10-1-393(a), Plaintiffs Thomas, Mitchell, and the Georgia Class are entitled to recover general damages pursuant to Ga. Code Ann. § 10-1-399(a).

445.    As a result of Wells Fargo's intentional violations of Ga. Code Ann. § 10-1-393(a), Plaintiffs Thomas, Mitchell, and the Georgia Class are entitled to recover exemplary damages pursuant to Ga. Code Ann. § 10-1-399(a).

446.    As a result of Wells Fargo's intentional violations of Ga. Code Ann. § 10-1-393(a), Plaintiffs Thomas, Mitchell, and the Georgia Class are entitled to recover treble damages pursuant to Ga. Code Ann. § 10-1-399(c).

447.    Plaintiffs Thomas, Mitchell, and the Georgia Class are entitled to recover reasonable attorney's fees and expenses of litigation pursuant to the GFBPA.

1

## COUNT VIII

2

**Violations of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. Ann. § 75-1.1 *et seq.***
**On Behalf of Plaintiffs Higgs, Agrawal, and the North Carolina Class**

3

4        448.    Plaintiffs Higgs and Agrawal repeat and reallege paragraphs 1–396 as if fully set forth

5    herein.

6        449.    Plaintiffs Higgs and Agrawal and the North Carolina Class members are persons under

7    the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). N.C. Gen. Stat. Ann. §

8    75-1.1 *et seq.*

9        450.    Wells Fargo's acts and practices complained of herein were performed in the course of

10   Wells Fargo's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen.

11   Stat. Ann. § 75-1.1(b).

12       451.    The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting

13   commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" *Id.* § 75-1.1(a). The

14   NCUDTPA provides a private right of action for any person injured "by reason of any act or thing

15   done by any other person, firm or corporation in violation of" the NCUDTPA. *Id.* § 75-16.

16       452.    In the course of its business, Wells Fargo intentionally engaged in unfair and deceptive

17   business practices, as set forth above in the paragraphs incorporated herein, in an effort to increase

18   revenue and income by enrolling its customers, including Plaintiffs Higgs, Agrawal, and North

19   Carolina Class members, in various products and services and then charging them for those

20   Unauthorized Products, without their knowledge and consent.

21       453.    Wells Fargo thus violated the NCUDTPA by, at minimum, employing deception,

22   deceptive acts or practices, and suppression or omission of any material fact with intent the others rely

23   upon such concealments, suppression, or omission.

24       454.    Wells Fargo engaged in misleading, false, unfair, or deceptive acts or practices that

25   violated the NCUDTPA by enrolling Plaintiffs Higgs, Agrawal, and North Carolina Class members in

26   products and services without their authorization and depriving them of any of the supposed benefits of

27   the products that customers were unknowingly enrolled in without their authorization.

28

455.    Wells Fargo's unconscionable trade practices take advantage of the lack of knowledge, ability, experience or capacity of Plaintiffs Higgs, Agrawal, and North Carolina Class members to a grossly unfair degree and to their detriment, as Wells Fargo surreptitiously enrolled them into products that they did not want or authorize and Wells Fargo surreptitiously took their money to pay for these products.

456.    Wells Fargo intentionally and knowingly deceived and misled Plaintiffs Higgs, Agrawal, and the North Carolina Class members.

457.    Wells Fargo knew or should have known that its conduct violated the NCUDTPA.

458.    Plaintiffs Higgs, Agrawal, and North Carolina Class members suffered ascertainable loss and actual damages as a direct and proximate result of Wells Fargo's conduct. Plaintiffs Higgs, Agrawal, and North Carolina Class members were involuntarily enrolled in and paid for the Wells Fargo products and services they did not want or need.

459.    Wells Fargo had an ongoing duty to Plaintiffs Higgs, Agrawal, the North Carolina Class members and all Wells Fargo customers to refrain from unfair and deceptive practices under the NCUDTPA in the course of its business.

460.    As a result of the foregoing conduct of Wells Fargo, Plaintiffs Higgs, Agrawal, and the North Carolina Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to treble damages, court costs and reasonable attorneys' fees, and any other just and proper relief available under N.C. Gen. Stat. Ann. § 75-16.

## COUNT IX

### Violations of the Arkansas Deceptive Trade Practices Act
### Ark. Code Ann. § 4-88-101 *et seq.*
### On Behalf of Plaintiff Brady and the Arkansas Class

461.    Plaintiff Brady repeats and realleges paragraphs 1–396 as if fully set forth herein.

462.    Wells Fargo, Plaintiff Brady, and the Arkansas Class are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("ADTPA"). Ark. Code Ann. § 4-88-102(6).

463.    The ADTPA prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." *Id.* § 4-88-107(10).

464.     In the course of its business, Wells Fargo engaged in unconscionable and deceptive business practices, as set forth above in the paragraphs incorporated herein, in an effort to increase revenue and income by enrolling its customers, including Plaintiff Brady and Arkansas Class members, in various products and services and then charging them for those Unauthorized Products, without their knowledge and consent.

465.     Wells Fargo's unconscionable trade practices take advantage of the lack of knowledge, ability, experience or capacity of Plaintiff Brady and Arkansas Class members to a grossly unfair degree and to their detriment, as Wells Fargo surreptitiously enrolled them into products that they did not want or authorize and Wells Fargo surreptitiously took their money to pay for these products.

466.     Plaintiff Brady and Arkansas Class members suffered ascertainable loss and actual damages as a direct and proximate result of Wells Fargo's unconscionable and deceptive acts or practices. Plaintiff Brady and Arkansas Class members paid for products and services they did not want or consent to.

467.     Plaintiff Brady and the Arkansas Class seek monetary relief against Wells Fargo in an amount to be determined at trial, attorneys' fees, and any other just and proper relief available under the ADTPA.

**COUNT X**

**Violations of the New Jersey Consumer Fraud Act**
**N.J. Stat. Ann. § 56:8-1 *et seq.***
**On Behalf of Plaintiff Boyle and the New Jersey Class**

468.     Plaintiff Boyle repeats and realleges paragraphs 1–396 as if fully set forth herein.

469.     Plaintiff Boyle, the New Jersey Class, and Wells Fargo are "persons" under the New Jersey Consumer Fraud Act ("New Jersey CFA"). N.J. Stat. Ann. § 56:8-1(d).

470.     The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any commercial practice that is unconscionable . . . in connection with the sale or advertisement of any merchandise[.]" *Id.* § 56:8-2.

471.     In the course of its business, Wells Fargo engaged in unconscionable and deceptive business practices, as set forth above in the paragraphs incorporated herein, in an effort to increase revenue and income by enrolling its customers, including Plaintiff Boyle and New Jersey Class

members, in various products and services and then charging them for those Unauthorized Products, without their knowledge and consent.

472.    Wells Fargo's unconscionable trade practices take advantage of the lack of knowledge, ability, experience or capacity of Plaintiff Boyle and New Jersey Class members to a grossly unfair degree and to their detriment, as Wells Fargo surreptitiously enrolled them into products that they did not want or authorize and Wells Fargo surreptitiously took their money to pay for these products.

473.    Wells Fargo's repeated violations present a continuing risk to Plaintiff Boyle and New Jersey Class members, as well as to the general public. Wells Fargo's unlawful acts and practices complained of herein affect the public interest.

474.    As a result of the foregoing wrongful conduct of Wells Fargo, Plaintiff Boyle and the New Jersey Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, costs and reasonable attorneys' fees under N.J. Stat. Ann. § 56:8-19, and all other just and appropriate relief.

## COUNT XI

### Unjust Enrichment
### On Behalf of Plaintiffs and the Nationwide Class

475.    Plaintiffs repeat and reallege paragraphs 1–396 as if fully set forth herein.

476.    This claim is plead in the alternative to the other causes of action to the extent Plaintiffs and Class members have no adequate remedy at law.

477.    As a result of Wells Fargo's unlawful, unfair, and deceptive actions described above, Wells Fargo was enriched at the expense of Plaintiffs and Class members through the payment of fees, penalties, interest, premiums, and other charges resulting from the products that Wells Fargo unlawfully, unfairly, and/or deceptively purchased in Plaintiffs' and Class members' names.

478.    Under the circumstances, it would be against equity and good conscience to permit Wells Fargo to retain the ill-gotten benefits that it received from Plaintiffs and Class members. Wells Fargo engaged in unlawful, deceptive, and unfair practices to enroll customers into products without their knowledge or consent in order to obtain benefits from this misconduct. As a result, it would be unjust for Wells Fargo to retain the benefits without restitution to Plaintiffs and Class members for the

money that Wells Fargo took from them, and disgorgement of the profits obtained by Wells Fargo that are lawfully the proceeds of Plaintiffs and Class members is appropriate.

## COUNT XII

### Conversion
### On Behalf of Plaintiffs and the Nationwide Class

479.    Plaintiffs repeat and reallege paragraphs 1–396 as if fully set forth herein.

480.    Plaintiffs and Class members own and have the right to possess the money that is and was in their financial accounts with Wells Fargo.

481.    Wells Fargo interfered with Plaintiffs' and Class members' possession of their money by wrongfully taking money directly from their accounts on the unfair and deceptive basis that they were fees, costs, payments, or other charges related to these accounts.

482.    Plaintiffs and Class members never authorized Wells Fargo to take money directly from their accounts to enroll them in products that they did not authorize.

483.    Wells Fargo's wrongful taking from Plaintiffs and Class members damaged them in an amount that is capable of identification through Wells Fargo's records.

## COUNT XIII

### Invasion of Privacy by Intrusion Upon Seclusion
### On Behalf of Plaintiffs and the Nationwide Class

484.    Plaintiffs repeat and reallege paragraphs 1–396 as if fully set forth herein.

485.    Based on the foregoing allegations, Wells Fargo intentionally interfered with the solitude, seclusion or private concerns or affairs of Plaintiffs and Class members. Specifically, Wells Fargo has no express authority to obtain the credit reports of Plaintiffs and Class members which Wells Fargo knew or should have known were unauthorized and would proximately cause harm to be suffered, including emotional distress when Plaintiffs and Class members learned of the unauthorized access of their credit reports.

486.    The actions of Wells Fargo into the affairs of Plaintiffs and Class members occurred in such a way that would be highly offensive to a reasonable person. A reasonable person would not believe that a financial institution would impermissibly obtain a credit report without authorization.

487.    The actions of Wells Fargo described above are a direct intrusion into the personal affairs of Plaintiffs and Class members, and are directly tethered to the pocket-book injuries caused by Wells Fargo. The information wrongfully gleaned by Wells Fargo was used to identify which Unauthorized Products to enroll Class members in and was used to facilitate enrollment. Wells Fargo is liable for actual damages in an amount to be determined and for an amount of punitive damages to be determined.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, pray for a Court order:

A.    Certifying the Class under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and/or 23(c)(4), appointing Plaintiffs as the Class Representatives, and Plaintiffs' counsel as Class Counsel;

B.    Finding Defendants' conduct was unlawful, as alleged herein, and entering judgment in favor of Plaintiffs and the Class on the claims asserted herein;

C.    Awarding declaratory relief against Defendants;

D.    Awarding Plaintiffs and Class members injunctive and other equitable relief, including requiring Defendants to cease their unlawful conduct complained of in this lawsuit; to identify all persons who were enrolled in the Unauthorized Products; to provide a full accounting of all amount Class members were charged for the Unauthorized Products, and all commissions, fees or amounts earned by Wells Fargo for enrolling Class members in the Unauthorized Products; to provide each member of the Class with restitution making them whole; to disgorge all unjust profits to the Class; and to cease and desist from providing insufficient, opaque, and incomplete information to members of the Class; and reforming the Wells Fargo remediation program so that, in conjunction with the resolution of this litigation, it provides full make-whole relief to all members of the Class;

E.    Awarding Plaintiffs and Class members nominal, statutory, actual, compensatory, consequential, incidental, enhanced, and punitive damages, as well as restitution and disgorgement as allowed by law or equity;

F.    Awarding pre- and post-judgment interest;

G.    Awarding reasonable attorneys' fees, expenses, and costs; and

H.    Granting such other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully submitted,

DATED this 26th day of December, 2024.

*s/ Derek W. Loeser*

KELLER ROHRBACK L.L.P.
Derek W. Loeser *
Gretchen Freeman Cappio *
Zachary W. Gussin *
Katherine J. Klein *
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
(206) 623-1900; Fax: (206) 623-3384
*dloeser@kellerrohrback.com*
*gcappio@kellerrohrback.com*
*zgussin@kellerrohrback.com*
*kklein@kellerrohrback.com*

ZIMMERMAN LAW OFFICES, P.C.
Thomas A. Zimmerman, Jr. *
Matthew C. De Re*
77 W. Washington Street, Suite 1220
Chicago, IL 60602
(312) 440-0020; Fax: (312) 440-4180
*tom@attorneyzim.com*

DANNLAW
Marc E. Dann *
Brian D. Flick (*pro hac vice forthcoming*)
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539; Fax: (216) 373-0536
*notices@dannlaw.com*

BLOOD HURST & O'REARDON, LLP
Timothy G. Blood (149343)
Paula R. Brown (254142)
501 West Broadway, Suite 1490
San Diego, CA 92101
(619) 338-1100; Fax: (619) 338-1101
*tblood@bholaw.com*
*pbrown@bholaw.com*

1
2
3
4
5

KAZEROUNI LAW GROUP, APC
Abbas Kazerounian (249203)
Pamela E. Prescott (328243)
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
(800) 400-6808; Fax: (800) 520-5523
*ak@kazlg.com*
*pamela@kazlg.com*

6
7
8
9

KELLETT & BARTHOLOW PLLC
Theodore O. Bartholow, III *
11300 N. Central Expy., Suite 301
Dallas, TX 75243
(214) 696-9000; Fax: (214) 696-9001
*thad@kblawtx.com*

10
11
12
13
14

EVANGELISTA WORLEY LLC
James M. Evangelista*
10 Glenlake Parkway
South Tower Suite 130
Atlanta, GA 30328
(404) 205-8400; Fax: (404) 205-8395
*jim@ewlawllc.com*

15
16
17
18
19

STERLINGTON, PLLC
Jennifer S. Czeisler *
Edward W. Ciolko*
One World Trade Center, 85th Floor
New York, NY 10007
(212) 433-2993
*jen.czeisler@sterlingtonlaw.com*
*edward.ciolko@sterlingtonlaw.com*

20
21
22
23

KOPELOWITZ OSTROW P.A.
Jonathan M. Streisfeld *
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
(954) 525-4100
*streisfeld@kolawyers.com*

24
25
26
27

MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
Alexander Wolf (299775)
280 South Beverly Drive, Penthouse
Beverly Hills, CA 90212
(872) 365-7060
*awolf@milberg.com*

28

TYCKO & ZAVAREEI LLP
Hassan A. Zavareei (181547)
2000 Pennsylvania Avenue, Northwest, Suite 1010
Washington, DC 20006
(202) 973-0900; Fax: (202) 973-0950
*hzavareei@tzlegal.com*

**\*** *Admitted Pro Hac Vice*

*Attorneys for Plaintiffs and the Putative Classes*